[Civ. No. 21749. First Dist., Div. Two. Nov. 17, 1964.]

EMBY FOODS, INC., et al., Plaintiffs and Appellants, v. CHARLES PAUL, as Director of Agriculture, Defendant and Respondent.

Willard S. Johnston, B. H. Parkinson, Jr., and Ackerman, Johnston, Johnston & Mathews for Plaintiffs and Appellants.

Stanley Mosk and Thomas C. Lynch, Attorneys General, Walter S. Rountree, Assistant Attorney General, and Donald H. Maffly, Deputy Attorney General, for Defendant and Respondent.

Emil Steck, Sr., as Amicus Curiae on behalf of Defendant and Respondent.

TAYLOR, J.—Order No. 68 of the defendant Director of the Department of Agriculture (hereafter referred to as the director) setting minimum prices for fluid milk in the Alameda-Contra Costa Marketing Area, contains a provision directing that the minimum retail prices for milk sold at a distributor's processing plant shall be 4 cents per gallon lower than the minimum retail store carry-out price and also set minimum retail prices for low-fat milk with a similar differential. Plaintiffs, who operate retail grocery stores in the marketing area, appeal from a judgment upholding the order.

While Order No. 68 was operative only for a short period of time and has since been superseded by subsequent unchallenged orders, this appeal presents a question of great public interest and continuing importance in the administration of the Milk Stabilization Law and thus the validity of the order should be determined.

The purpose of the Milk Stabilization Act (Agr. Code, ch. 17, §§ 4200-4420), under which Order No. 68 was issued, is to eliminate unfair, unjust, destructive and demoralizing trade practices in the producing, marketing, sale, processing or distribution of milk, which tend to undermine the standards of quality without which, in many cases, milk would be unfit for human consumption (Agr. Code, §§ 4200, 4201).

The director is authorized to prescribe marketing areas (Agr. Code, § 4202) and to determine prices which take into account the varying factors in the cost of production and distribution, provided that the cost to distributors within any marketing area shall be uniform with all other distributors purchasing fluid milk and fluid cream of similar grade or quality under like terms and conditions (Agr. Code, § 4204). The underlying theory of the act is that the director shall fix reasonable prices at all levels to insure a sufficient supply of milk for the public (Agr. Code, §§ 4205, 4360) and to bring about a reasonable amount of stability and prosperity in the marketing of milk.[1] The power of the state to thus regulate the milk industry and the general authority of the director to stabilize the industry by fixing reasonable prices have been held a valid exercise of the police power (*Jersey Maid Milk Products Co.* v. *Brock*, 13 Cal.2d 620 [91 P.2d 577]; *Ray* v. *Parker*, 15 Cal.2d 275 [101 P.2d 665]).

In the exercise of this authority, the director has established the following kinds of distributors which sell directly

---

[1]Chapter 17 of the Agricultural Code is supplemented by chapter 16 (§§ 4100-4195) relating to the marketing of milk and other dairy products, as well as by division 4 (§§ 440-708) of the Agricultural Code which sets forth the applicable quality and health standards. Under these various provisions, all of the milk produced in the state is divided into two categories: ''market'' or ''fluid'' milk and ''manufacturing'' milk. ''Fluid milk'' is designated for immediate consumption and is subject to higher standards of quality and sanitation in production and processing than manufacturing milk (*Jersey Maid Milk Products Co.* v. *Brock*, 13 Cal.2d 620 [91 P.2d 577]). ''Fluid milk'' is further divided into several classes based on fat content and use (Agr. Code, §§ 4225-4232). ''Fluid milk'' is defined as all whole or concentrated milk produced in conformity with applicable health regulations (Agr. Code, § 4212) and includes fluid low-fat milk (Agr. Code, §§ 4351 and 626.1). As we are concerned only with fluid milk in this case, we refer to fluid milk simply as milk.

to consumers:[2] home delivery; retail stores,[3] like those owned by plaintiffs who sell milk and dairy products to the public; distributors selling milk to consumers at their processing plants, hereafter referred to as "docks"; and producers'[4] ranches where milk is produced, processed and offered for retail sale, hereafter referred to as "ranches."[5]

Beginning in 1946, the price orders for milk in the Alameda-Contra Costa Marketing Area provided that milk sold to consumers at ranches could be sold at a minimum price of 1 cent per quart below the minimum price then set for retail stores. In 1956, the director issued an order providing that milk sold to consumers at docks could be sold at a minimum price of 1½ cents per quart below the minimum retail store price. Thus, there was established a "ranch differential" of 4 cents per gallon and a "dock differential" of 6 cents per gallon.

In June 1961, the director issued a milk price order allowing retail stores to give their customers a discount of 4 cents per gallon, if the customer bought a gallon or more in half-gallon containers. Thus, the "dock differential" for retail store sales of milk in half-gallon containers in gallon quantities was decreased to one-half cent per quart *or* 2 cents per gallon. The former dock differential of 6 cents per gallon, however, remained in effect as to retail store sales of less than one gallon or as to gallon sales in other than half-gallon containers.

On April 19 and 20, 1962, the director held a hearing in Concord for the purpose of establishing facts bearing on the continuance of the 4-cent per gallon discount for milk purchased at retail stores and possible changes in the minimum prices for the sale of milk at retail stores, docks and ranches, as well as to establish the minimum prices for a new product, low-fat milk. The transcripts of several prior hearings held in 1961 were admitted into evidence. After the conclusion of the hearing, the director made findings and issued the order which is the subject of this action.

Order No. 68, effective on June 1, 1962, eliminated the retail stores' 4-cent per gallon discount mentioned above,

---

[2] A consumer is any person who buys milk, cream or dairy products for consumption and not for resale (Agr. Code, §§ 4108, 4221).

[3] A retail store sells milk for consumption to the general public off the premises (Agr. Code, §§ 4218, 4106).

[4] Section 4215 of the Agricultural Code.

[5] Sections 4216 and 4217 of the Agricultural Code.

set minimum prices for low-fat milk, and lowered the retail store price by 1 cent and dock price by one-half cent a quart. On quart sales, the differential between the docks and retail stores was narrowed from 1½ cents per quart to 1 cent per quart, the differential between the ranches and retail stores was narrowed from 2 cents per quart to 1 cent per quart, and the differential between home delivery and retail stores increased from one-half cent a quart to 1½ cents a quart. The elimination of the 4-cent per gallon discount for retail stores for milk purchased in half-gallon containers in quantities of a gallon or more, increased the price differential in this classification between retail stores and docks from one-half cent per quart, or 2 cents per gallon, to 1 cent per quart, or 4 cents per gallon.

On June 11, 1962, plaintiffs filed their complaint in this action alleging that the director acted arbitrarily and capriciously and discriminated in favor of the docks in eliminating the 4-cent per gallon discount and in setting the new minimum prices for milk and low-fat milk. Plaintiffs further alleged that the elimination of the discount and the new minimum prices were promulgated in violation of the applicable statutes without consideration of the relevant cost factors, were based on insufficient evidence, and contrary to proper procedures, and they sought a permanent injunction.

The court below found that there was substantial evidence in support of the minimum prices set by Order No. 68 for milk and low-fat milk; that the findings were sufficient; and that although at the hearings the attorneys for the interested parties were not permitted to cross-examine certain witnesses, plaintiffs were not materially prejudiced thereby. The court concluded that the director had not abused his discretion in establishing the minimum prices in question and denied plaintiffs' request for a permanent injunction. The court rendered its judgment in favor of the director but continued the preliminary injunction pending further proceedings.

## I. The Elimination of the Four Cents per Gallon Discount at the Retail Store Level

The chief contention on appeal is that the director acted arbitrarily and capriciously in eliminating the retail stores' 4-cent per gallon discount, thus increasing the dock differential from 2 to 4 cents per gallon where one or more gallons were purchased in half-gallon containers.

In promulgating minimum price orders, the director acts in quasi-legislative capacity and is, therefore, vested with

broad discretion. The establishment of minimum prices involves highly technical matters requiring the assistance of skilled and trained experts and economists and the gathering and study of large amounts of statistical information.

If the minimum price order is promulgated pursuant to the procedures provided by law, it must be sustained unless the director's action has been arbitrary, capricious or entirely lacking in evidentiary support (*Ray* v. *Parker,* 15 Cal.2d 275, 304, 311 [101 P.2d 665]; *Sentell* v. *Jacobsen,* 163 Cal.App. 2d 748, 754-755 [329 P.2d 932]; *Knudsen Creamery Co.* v. *Brock,* 37 Cal.2d 485, 495 [234 P.2d 26]; *Brock* v. *Superior Court,* 109 Cal.App.2d 594, 604 [241 P.2d 283]). A court may not exercise independent judgment on the facts or substitute its judgment for that of an administrative agency acting in a quasi-legislative capacity (*Brock* v. *Superior Court, supra*; *Pitts* v. *Perluss,* 58 Cal.2d 824, 832 [27 Cal.Rptr. 19, 377 P.2d 83]).

In determining whether the director has acted arbitrarily or capriciously, this court cannot inquire whether, if it had power to promulgate the price order, it would have adopted some method or formula other than that used by the director (*Ray* v. *Parker, supra,* at p. 311; *Pitts* v. *Perluss, supra,* at pp. 834-835). Thus, we need only consider whether, as a matter of law, there was a reasonable basis for Order No. 68 (*In re Redevelopment Plan for Bunker Hill,* 61 Cal.2d 21, 47-50 [37 Cal.Rptr. 74, 389 P.2d 538]).

Plaintiffs first argue that the director was not authorized to establish different minimum retail prices for retail stores and docks. This issue was clearly settled in *Misasi* v. *Jacobsen,* 55 Cal.2d 303 [10 Cal.Rptr. 850, 359 P.2d 282]. There, the plaintiffs, operators of retail stores in the Stockton-San Joaquin Marketing Area, appealed from a judgment upholding the validity of an order setting the minimum retail prices for docks at two cents a quart below the specified minimum retail store prices. In affirming the judgment, the Supreme Court said at page 309: "The director's findings show that his order tends to accomplish the purpose of the milk marketing provisions of the code, namely, that 'the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the marketing area.' (*Challenge Cream etc. Assn.* v. *Parker,* 23 Cal.2d 137, 141-142 [142 P.2d 737, 149 A.L.R. 1203].) Invalidation of the minimum price in question would frustrate that purpose

because consumers, who would be compelled to pay the industry defendants [docks] two cents more for a quart of milk, would not be able to purchase milk 'at the lowest price' consonant with the marketing conditions contemplated by the code. Section 4205 provides that the director's powers shall be liberally construed, and we are satisfied that there is no sound reason to reject his interpretation of the code or invalidate his action here.''

Plaintiffs attempt to distinguish the *Misasi* case on the grounds that the docks in the Stockton-San Joaquin Marketing Area did not sell nondairy products to consumers as do the docks in the Alameda-Contra Costa Marketing Area. A cursory glance at the eloquent dissent in the *Misasi* case (55 Cal. 2d 310-314) indicates that such was not the case.

Plaintiffs seek to distinguish *Misasi* on the grounds that there the findings of the director were based on uncontroverted evidence, while here the evidence was conflicting and inadequate. There was substantial evidence to sustain the director's findings and nothing more is required. Many complex facts were presented and considered at the hearings. All the parties agreed that while the production of milk had increased, there was an overall decline of per capita consumption in the market area despite a sizeable increase in population; that of the total volume of milk sales, the retail stores did about 65 per cent; the docks 8-10 per cent; and the home deliveries the remainder. The dock and ranch owners testified that their volume had decreased after the introduction of the 4-cent a gallon discount. There was evidence that milk accounted for only 8 per cent of the retail stores' overall sales volume; and that four out of five milk sales made by the stores were in quantities of less than one gallon.

 In establishing minimum prices, the director is not limited to acting on the facts adduced at price hearings (*Ray* v. *Parker,* 15 Cal.2d 275, 303-304 [101 P.2d 665]; *Brock* v. *Superior Court,* 109 Cal.App.2d 594, 606 [241 P.2d 283]). Order No. 68 cannot be considered without reference to the prior orders, nor can the elimination of the 4-cent per gallon discount be considered without reference to the contemporaneous price reduction. Each new minimum price order is an amendment of a prior order based on the constantly revised data kept by the director on the milk industry.

 The director established that the introduction of the 6-cent per gallon differential between the stores and docks in 1956 had shifted too much volume to the docks, thus justify-

ing the introduction of the 4-cent per gallon discount. He explained how sudden shifts in sales volume from one method of distribution to another can create instability in the market by causing overexpansion of processing facilities, loss of markets by dairy farmers, increases in the costs of distribution resulting in higher prices to consumers and the stimulation of unfair trade practices in the industry. The record disclosed that the director considered long-term as well as short-term trends and patterns of milk consumption in the total market and concluded that throughout the state, a differential of 4 cents per gallon between the two methods of distribution had emerged as a stabilizing factor.

Considering all of the evidence presented at the hearing in the light of other facts known to him and his duties under the Milk Stabilization Act, the director could properly conclude that the combination of the elimination of the quantity discount together with the various price reductions ordered would not unduly harm plaintiffs and would encourage the orderly and efficient marketing of milk as to all methods of distribution. ■ Furthermore, the price reduction to consumers provided by the order was in accord with the administrative standards of the act in making milk available at the lowest price (Agr. Code, § 4205; *Challenge Cream etc. Assn.* v. *Parker,* 23 Cal.2d 137, 141-142 [142 P.2d 737, 149 A.L.R. 1203].) We conclude that the director's action was neither arbitrary nor capricious.

## II. The Cost Factors Considered by the Director in Setting the Minimum Retail Prices of Milk Under Order No. 68

■ Plaintiffs argue that the director violated section 4360 of the Agricultural Code[6] in determining the cost of the retail stores' handling and distribution of milk on the basis of their overall cost of doing business.

Section 4355, subdivision (g), of the Agricultural Code

---

[6]Section 4360 provides that minimum retail and wholesale prices to be established for distributors in a marketing area and the minimum retail prices for retail stores therein shall be sufficient, but not more than sufficient, to cover such costs as are described in section 4355, according to the method of distribution and reasonable return upon necessary capital investment; provided, however, that when the director determines that such a price will not effectuate the purposes of the act, he shall establish minimum prices which are higher or lower than those sufficient to cover the costs and reasonable return if he finds in writing that his action will insure adequate supplies at prices no higher than necessary and will not induce unfair competition. Section 4355 prescribes different standards by which the costs of retail stores and docks are to be determined by the director.

relating to the consideration of costs by the director in the determination of milk prices for retail store distribution provides: "The reasonably necessary cost of handling fluid milk or fluid cream, or both, incurred by retail stores, as such costs are determined by impartial cost surveys, or examination of the books and records, or both, of such portion of the retail stores in such marketing area as are reasonably determined by the director to be sufficiently representative to indicate such costs of all retail stores in such marketing area. In determining such costs incurred by retail stores handling commodities in addition to fluid milk or fluid cream, or both, the director shall determine the cost of doing business for each such representative retail store and for such purpose shall consider all costs and expenses of doing business including depreciation on inventory and equipment. *In the absence of satisfactory evidence to the contrary, the cost of handling such fluid milk or fluid cream, or both, shall be presumed to be the same percentage as the cost of doing business of such retail store in conducting its entire business."* (Italics supplied.)

Plaintiffs argue that the director was not entitled to rely on the presumption in the last sentence of subdivision (g) because the presumption was rebutted as a matter of law by their exhibit entitled "Retail Store Costs for Purchase of Single and Multiple Units of Quart and Half Gallon Cartons of Fluid Milk." This exhibit was originally prepared by the Bureau of Milk Stabilization for the April 1961 hearing but offered at the April 1962 hearing in Concord by plaintiffs' attorney.

At the 1961 hearing, the supervising auditor of the Bureau of Milk Stabilization explained that the exhibit represented a study of only two large supermarkets in the marketing area, both of which owned their own milk processing and distributing facilities and that it did not accurately reflect the actual costs of representative retail stores in the area as required by Agricultural Code section 4355, subdivision (g), quoted above. Thus, although the exhibit was admitted, the director justifiably refused to rely on it on the ground that it was not satisfactory evidence of actual costs.

The director was entitled to rely on the presumption, as disputable presumptions are a form of evidence (Code Civ. Proc., §§ 1957, 2061, subd. 2; *Smellie* v. *Southern Pacific Co.,* 212 Cal. 540, 551-552 [299 P. 529]), dispelled as a matter of law only when a fact which is wholly irreconcilable with it is

proved by the uncontradicted testimony of the party relying on it or of such party's own witness (*Leonard* v. *Watsonville Community Hospital*, 47 Cal.2d 509, 517 [305 P.2d 36].)

Plaintiffs next argue that the director abused his discretion in eliminating the 4-cent per gallon discount because section 4357 of the Agricultural Code required him to allow it where there was "cost justification."

Section 4357 provides that the minimum retail price schedule for milk established by the director for retail stores ". . . may provide for quantity discounts, such discounts to be no more than those which give effect to store handling cost differences in the sale of single orders of varying quantities of . . . milk . . . to retail consumers."

The cost justification alluded to by plaintiffs could not be the obvious one that it is cheaper to sell in larger quantities, as section 4357 itself recognizes this saving, clearly defining the director's authority *in permissive terms only* and prescribing a definite standard for the discount's application.

■ Furthermore, the director is authorized to fix prices below cost and a reasonable return pursuant to section 4360 where necessary to carry out the purposes of the act and here the prices established by Order No. 68 actually allowed retail stores to sell milk below cost and reasonable return as calculated on the basis of the presumption permitted under section 4355, subdivision (g). Thus, a mandatory discount order could not be required of the director on the basis of any "cost justification" in the general application of that term.

■ The authorities cited by plaintiffs indicate that the word "may" in a statute will be construed to mean "must" only where there is clearly manifested a legislative intent that given a certain set of circumstances a mandatory duty was to be conferred rather than a discretionary one (*Griffin* v. *Board of Supervisors*, 60 Cal.2d 318 [33 Cal.Rptr. 101, 384 P.2d 421]). There is nothing to indicate that this was the intent of section 4357. In fact, the construction urged by plaintiffs would result in the unreasonable subservience of the broad principles governing the setting of minimum prices and stabilizing the milk industry to the statute authorizing discounts.

■ Plaintiffs next argue that in setting the minimum prices in question, the director erroneously deviated from the standard of cost plus a return on investment. The director's authority to set minimum prices within methods of distribution at higher or lower than the cost plus return on investment standard in order to achieve stability has been repeatedly up-

held by the courts (*Misasi* v. *Jacobsen, supra*; *Sentell* v. *Jacobsen, supra*). As we have pointed out above, one of the primary purposes of price setting under the Act is to insure a sufficient supply of milk (Agr. Code, §§ 4205, 4360).

Plaintiffs' argument was completely answered in *Challenge Cream etc. Assn.* v. *Parker,* 23 Cal.2d 137 at page 141 [142 P.2d 737, 149 A.L.R. 1203] as follows: ''The purpose of the act can be fairly summarized as follows: That the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the marketing area. In order to effect this purpose producers and distributors must be prohibited from selling their milk at a lower price than that at which the entire consumer demand can be supplied at no more than a reasonable profit. Without such restriction, when one sells milk at amounts less than that at which some or many of his competitors can profitably do business, in an effort to meet the reduced prices they will be forced out of business, leaving the public with an inadequate milk supply. But each marketing area in which regulation is to be accomplished must have substantially similar economic conditions so that a uniform price will be fair to all concerned. Thus under the present law no injury can be done to a reasonably efficient distributor or producer unless someone operating in the same area sells at a price lower than the minimum at which he can do business or gives special inducements to customers which amount to an unfair practice within the meaning of the act. (Agr. Code, § 736.3.)

''It is of particular significance in this connection that nothing in the act prevents a particular producer or distributor from selling at the minimum price even though, by the use of more expensive equipment or unwise management, he is marketing his product at a price less than enough to return to him a reasonable profit.''

Plaintiffs next argue that the director should make them more competitive with the docks and ranches by establishing their wholesale prices on the basis of the cost of glass containers rather than the cost of fiber containers. The record reveals that all retail store sales are made in fiber containers while dock sales are made in glass containers. ▮ Although this contention was made by plaintiffs' counsel at the April 1962 hearings, it was not raised in the trial court below and, therefore, cannot be reviewed on appeal (*Green* v. *Green,* 215

Cal.App.2d 31 [30 Cal.Rptr. 30]; *Knapp* v. *City of Newport Beach,* 186 Cal.App.2d 669, 679 [9 Cal.Rptr. 90]; *Loving & Evans* v. *Blick,* 33 Cal.2d 603, 613 [204 P.2d 23]). We note in passing, however, that the issue has been determined adversely to the plaintiffs (*Challenge Cream etc. Assn.* v. *Parker,* 23 Cal.2d 137 [142 P.2d 737, 149 A.L.R. 1203]; *Sentell* v. *Jacobsen,* 163 Cal.App.2d 748 [329 P.2d 932]).

We conclude that the director considered all the relevant cost factors in setting the minimum prices for milk in Order No. 68, and properly exercised his stabilizing authority in establishing the differentials between docks and retail stores.

III. The Minimum Prices for Low-Fat Milk

Plaintiffs next argue that the minimum prices set by the director for low-fat milk[7] by Order No. 68 are likewise capricious and arbitrary and based on insufficient data. The record indicates that low fat milk was a new product in California. In 1961, the Legislature added section 626.1 of the Agricultural Code, which established the standard for low-fat milk[8] (Stats. 1961, ch. 2126, p. 4386, § 1) and also provided: "This section shall not become operative until the minimum producer prices for Class 1 usage established under the provisions of Chapter 17 (commencing with Section 4200), Division 6 of this code are established on a milk-fat and milk solids not fat basis and shall remain in effect until October 1, 1963."

As it is illegal to market a product for which there is no definition and standard in the code (Agr. Code, § 527), the above quoted provision permitted the sale of low-fat milk only after the establishment of a minimum producer price. By an amendment to section 4351 of the Agricultural Code (Stats. 1961, ch. 2126, p. 4388, § 7), the Legislature authorized the director to establish minimum prices for low-fat milk. Under section 4361 of the Agricultural Code, in any marketing area where producer prices are established (by means of a

---

[7]The minimum retail prices for low-fat milk established by Order No. 68 were as follows:

| | Docks | Retail Stores |
| --- | --- | --- |
| Gallons | 86 cents | 90 cents |
| ½ Gallons | 43 cents | 45 cents |
| Quarts | 22 cents | 23 cents |

[8]"Low fat milk is a market milk product. Low fat milk shall contain not less than 1.9 percent milk fat, not more than 2.1 percent milk fat, and not less than 10 percent of milk solids not fat. Low fat milk may contain added vitamins and minerals, provided that such low fat milk is labeled to indicate such additions and the amount thereof. Low fat milk shall otherwise meet all standards and requirements specified in this division for market milk and shall be labeled 'low fat milk.'"

stabilization and marketing plan pursuant to section 4281), the director must also establish minimum retail prices. Thus, the director had the duty of setting minimum prices for a new product which was not yet on the market and on which no cost data were available at the outset.

On February 19 and 20, 1962, the director held consolidated hearings in San Francisco for the purpose of gathering cost data on which to base low-fat milk prices in eight marketing areas, including the Alameda-Contra Costa Marketing Area. At this hearing, the director introduced into evidence a number of studies projecting the costs as to low-fat milk on the basis of the comparative cost of whole milk. At this and a subsequent hearing held in February 1962, the milk dealers' association representative testified that "Initially, the consumer price for low-fat milk should be established at a level which is no more than one cent per quart below the established price for regular milk." This was in accord with the view of an economist for one of the plaintiffs that there was a reasonable basis for establishing such a price relationship since low-fat was an intermediate product between regular milk and skim milk. Following this hearing, Order No. 67 was issued effective April 1, 1962, establishing the minimum low-fat milk price at one-cent less per quart than that established for whole milk with respect to each container size and method of distribution. Thus, April 1, 1962, was the first day on which low-fat milk could be legally sold in the Alameda-Contra Costa Marketing Area.

When Order No. 67 was superseded by Order No. 68, the same method of establishing prices for low-fat milk was used. Plaintiffs' argument appears to be directed not to the method used to establish the minimum price for low-fat milk, but to the maintenance of the dock differential as to low-fat milk prices. This differential properly reflected the lower costs inherent in the dock method of distribution and was well within the authority of the director (*Misasi* v. *Jacobsen,* 55 Cal.2d 303 [10 Cal.Rptr. 850, 359 P.2d 282]).

We conclude that the minimum prices established by the director for low-fat milk in Order No. 68 were set in accordance with his statutory authority and were supported by sufficient evidence.

### IV. PROCEDURAL ISSUES

Finally, plaintiffs argue that even if Order No. 68 was properly issued, the director was guilty of certain major procedural defects which require a reversal of the judgment.

A. *Sufficiency of the Findings.*

Section 4360 of the Agricultural Code provides that when the director establishes minimum prices which are higher or lower than sufficient to cover costs and reasonable return on capital investments, he is required to make the determinations set forth in subdivisions (a) and (b) and set them forth as written findings. As Order No. 68 contained some minimum prices above and below cost, the director issued his findings prior to the promulgation of the order. Plaintiffs complain that these findings are ultimate findings in the language of section 4360, subdivisions (a) and (b), and that the statute requires the director to make specific findings.

Detailed and specific findings are not required in a proceeding before an administrative body unless the statute authorizing the proceeding requires them (*Palm Springs T. Club* v. *California Horse etc. Board,* 155 Cal.App.2d 242, 245 [317 P.2d 713]). In the *Palm Springs* case, the court expressly upheld administrative findings that restated the language of the statute. Also in accord are *Southern Calif. Jockey Club* v. *California Horse Racing Board,* 36 Cal.2d 167, 177 [223 P.2d 1] ; *Webster* v. *Board of Dental Examiners,* 17 Cal.2d 534, 543 [110 P.2d 992] ; *Mandel* v. *Cemetery Board,* 185 Cal.App.2d 583, 587-588 [8 Cal.Rptr. 342]. *California Motor Transport Co.* v. *Public Utilities Com.,* 59 Cal.2d 270 [28 Cal.Rptr. 868, 379 P.2d 324], cited by plaintiffs is not relevant as the opinion was based on language added to section 1705 of the Public Utilities Code in 1961 requiring findings on all issues material to the order or decision.

Section 4360 of the Agricultural Code does not require specific or detailed findings and the 1963 Legislature refused to amend the statute to require them (S.B. 1196).

B. *Denial of Cross-Examination, and Access to Cost Studies.*

Plaintiffs argue that Order No. 68 was rendered fatally defective because at the April 19, 1962, hearing, the director did not allow plaintiffs' attorney to cross-examine witnesses other than those on the hearing panel representing the director. The record reveals that on one occasion, the hearing officer denied plaintiffs' counsel the right to cross-examine a witness on the ground that it was not proper administrative procedure. The court below found that: "Reasonable cross-examination should have been permitted, but considering the entire record, the plaintiffs have not been materially prejudiced thereby."

The hearing officer's ruling was correct. In *Ray* v. *Parker*, 15 Cal.2d 275, 304 [101 P.2d 665], the court held that the hearings under the milk act are quasi-legislative. While the right to cross-examine witnesses in quasi-judicial hearings is well established (*La Prade* v. *Department of Water & Power*, 27 Cal.2d 47, 52 [162 P.2d 13]), there are no strict or formal procedural and evidentiary rules governing quasi-legislative proceedings. In quasi-legislative proceedings, there is no constitutional right to any hearing and a hearing of a judicial type is not required (*Franchise Tax Board* v. *Superior Court*, 36 Cal.2d 538, 549 [225 P.2d 905]). As the hearing in such a proceeding is one allowed by legislative grace, it is not governed by the stricter procedural rules applicable to quasi-judicial proceedings (*Ray* v. *Parker, supra,* at pp. 304-305). We agree with the trial court, however, that in the interest of fairness and ascertaining the relevant facts, it would be preferable for the director to allow reasonable cross-examination of all witnesses if feasible under the circumstances.

As to the denial of plaintiffs' request for the examination of the director's cost studies, *Ray* v. *Parker, supra,* at pages 303-304, held that the director is not required to offer in evidence cost studies resulting from the investigation of his staff, but need only make known the result of these investigations and surveys. In the instant case, the summaries of the cost studies were introduced into evidence and members of the hearing panel were available for and subject to the cross-examination of persons at the hearing. Plaintiffs erroneously rely on *Olive Proration etc. Com.* v. *Agricultural etc. Com.*, 17 Cal.2d 204 [109 P.2d 918], which expressly distinguished *Ray* v. *Parker, supra,* as the evidence in the *Olive* case was secretly received by the commission *after* it had determined the issues.

The record of the April 19 and 20, 1962, hearings shows that plaintiffs' counsel was allowed more time for the examination of witnesses and cross-examination of panel members than any of the other parties present. Thus, we conclude that the record is devoid of any procedural defects which compel a reversal of the judgment.

We need not concern ourselves with plaintiffs' contentions that Order No. 68 resulted in unconstitutional discrimination against retail stores as this matter was not raised below (*Damiani* v. *Albert*, 48 Cal.2d 15, 18 [306 P.2d 780]).

The judgment in favor of the director is affirmed and the preliminary injunction dissolved.

Shoemaker, P. J., and Agee, J., concurred.

A petition for a rehearing was denied December 17, 1964, and appellants' petition for a hearing by the Supreme Court was denied January 13, 1965. Mosk, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.