[Civ. No. 31355. First Dist., Div. One. Aug. 28, 1974.]

ROBERT KAHN, Plaintiff and Appellant, v.
EAST BAY MUNICIPAL UTILITY DISTRICT et al.,
Defendants and Respondents.

## COUNSEL

Herzstein, Maier & Lippett, Herzstein & Maier, Paul C. Maier and Edward Newman for Plaintiff and Appellant.

John B. Reilley, Frank E. Howard, Wayne N. Witchez and Robert B. Maddow for Defendants and Respondents.

## OPINION

**SIMS, J.**—Petitioner and appellant, a property owner within the East Bay Municipal Utility District, has appealed from a judgment which denied him any relief on his petition for a writ of mandate, filed on behalf of himself and all property owners with the district, to secure a writ ordering the district, through its board of directors, to set water rates at levels which would eliminate the need for property tax revenues and to delete from the property tax rolls any property tax levies attributable to the district. The controversy centers on the provisions of section 12809 of the Public Utilities Code which empowers the board of directors to fix rates and charges,[1]

---

[1]Section 12809 provides: "The rates and charges for commodities or service furnished by a district shall be fixed by the board. As far as possible utilities shall be self-supporting but the board is not required to fix a rate which in its opinion is unreasonably high, nor to cover by rates large expenditures and the interest thereon required for future needs and developments."

and sections 12891 and 12892 which authorize the levy and collection of taxes.[2]

Petitioner contends that the district's directors abused their discretion in setting water rates so low as to require the raising of additional revenues from property taxes. Preliminarily he is faced with findings of the lower court to the effect that he had a plain, speedy and adequate legal remedy available to contest the imposition of the taxes under the Revenue and Taxation Code, and that he failed to avail himself of that remedy. It is also asserted that procedurally he is barred from any relief by way of writ of mandamus because the taxes in question have been levied, collected and turned over to the district for its use with its operating revenues.

It is concluded that although a writ of mandate will not ordinarily issue to control the levy or imposition of a tax, because of the interrelationship between the rate-fixing power and the taxing power of the district, the petition was properly entertained to review the action of the directors in fixing the rates, and to control the exercise of their taxing power insofar as it was affected by any abuse of discretion in the former field. It is further determined that the public interest in the interpretation of the provisions of section 12809 of the Public Utilities Code and the ongoing program of the district requires a determination of the merits of the controversy. Finally it is concluded that section 12809 does not require the directors to fix rates and charges which are not lower than prices for water generally before they can resort to the taxing power, and that the action of the trial court in finding that the directors had sufficient evidentiary foundation for their actions in fixing the water rates and in levying taxes was proper. That there was no abuse of discretion in either regard is sustained by the record. The judgment must be affirmed.

The petition was filed September 3, 1970, shortly after the board of directors, on August 25, 1970, adopted a resolution approving a budget and fixing tax rates for the fiscal year 1970-1971. Respondents' demurrer on grounds now urged in support of the judgment was overruled. An answer was filed by respondents denying all the material allegations of the

---

[2]Section 12891 reads: "A district may levy, and collect or cause to be collected, taxes for any lawful purpose."

Section 12892 states: "If, in the opinion of the board, the revenues will not be sufficient for any and all lawful purposes the board shall levy a tax for such purpose or purposes and fix the amount of money necessary to be raised therefor by taxation."

Under the provisions of sections 12897 through 12901 the board of directors is authorized to, and in this case it did, avail itself of existing assessments made by county assessors of Alameda and Contra Costa Counties and the State Board of Equalization, and provide for collection of taxes, at rates fixed by the board, by county tax collectors.

petition, and thereafter their motion for summary judgment was denied. Respondents then moved to have the matter specially set for hearing on the grounds that the sole issue presented by the petitioner's pleadings was whether the water rate schedule as set by the board the preceding fall, on October 14, 1969, was supported by sufficient evidence. Petitioner represented to the court that the only evidence he wished to present was evidence of water rates existing in other Northern California areas, and that if such evidence was inadmissible the matter could be submitted. The matter was accordingly specially set for trial.

Petitioner had attached to the memorandum of points and authorities in support of his petition an exhibit setting forth water rates in some 23 communities. He alleged that they demonstrated, and they do demonstrate, that all of the rates were higher than those fixed by respondent district. At the trial he stated that he was prepared to show that the rates for water charged in substantially all of the other areas in Northern California which sell water, and perhaps most of the districts which sell water in the State of California were higher than the rates fixed by respondents. The trial court found that petitioner was present at the public hearing on respondents' water rates, objected to the rates, but presented no evidence to support his objection. The court concluded that petitioner was not entitled to produce evidence that was not before the board when it evaluated respondents' water rates and when it fixed the tax rate for 1970-1971.[3] In so ruling the trial court was correct. (See *Albonico* v. *Madera Irr. Dist.* (1960) 53 Cal.2d 735, 739 [3 Cal.Rptr. 343, 350 P.2d 95] [overruled on other grounds (1958) 357 U.S. 275 (2 L.Ed.2d 1313, 78 S.Ct. 1174)]; *Upton* v. *Gray* (1969) 269 Cal.App.2d 352, 358-359 [74 Cal.Rptr. 783]; *Porter* v. *City of Riverside* (1968) 261 Cal.App.2d 832, 836-837 [68 Cal. Rptr. 313]; and *Jenner* v. *City Council* (1958) 164 Cal.App.2d 490, 497-498 and 499-500 [331 P.2d 176]. Cf. *Lotus Car Ltd.* v. *Municipal Court* (1968) 263 Cal.App.2d 264, 268 [69 Cal.Rptr. 384]; and note *Strumsky* v. *San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32 [112 Cal.Rptr. 805, 520 P.2d 29] [local administrative agencies].)

The trial court considered the matter on the petition, respondents' answer, and the affidavits which had been filed in connection with respondents' motion for summary judgment. Following briefing the court gave

---

[3]Apparently it was petitioner's position that the evidence was material to show either that the board had considered the comparable rates and abused its discretion in setting rates substantially lower, or, in the alternative, that the board in failing to consider the comparable rates had acted capriciously and arbitrarily in setting its own rates so low. On appeal petitioner tacitly acknowledges that the evidence offered by him was not before the board, but urges (see part III below) that the record affirmatively reflects a failure to comply with the provisions of section 12809 (fn. 1 above).

notice of its intended decision denying the petition. After a delayed settlement of findings, judgment was entered. Petitioner's motion for new trial was denied, and this appeal ensued. The record reflects the following facts.

On April 2, 1969, two of the district directors, who constituted the finance committee, filed a memorandum containing a summary of a "Recommended Financing Plan" for the five-year period from July 1, 1969, through June 30, 1974, which had been prepared by the finance department of the district. The plan recommended: (1) Continuation of the current basic tax rate of 16.3 cents; (2) borrowing for selected projects in an amount then estimated at $21.6 million; and (3) adoption of a new water rate structure to become effective November 1, 1969, to provide an overall 18 percent increase in water revenue.

The plan in its financial forecast for the five-year period noted that there presently existed a $25.1 million surplus at existing water rates, after providing for operations and debt service, and that the total construction program of $66.9 million left the sum of $41.8 million needed to carry out the construction program in full. The plan recommended financing this amount by borrowing $21.6 million, increasing the water revenues by 18 percent to raise $17 million and leaving $3.2 million unprovided for.

In a section labeled "Tax Rate" the summary noted: "At the informal direction of the Board of Directors, the District staff conducted a study of an appropriate relationship between water and tax revenues. *Based on the principle that the portion of the total District costs applicable to fire protection should be borne by property owners (taxpayers) rather than water consumers, they determined the percentage of water and tax revenue which should be obtained from each of those sources."* (Italics added.)

In a section labeled "Water Revenue Increase" the plan noted: "We recommend an 18% increase in water revenue, which is estimated will provide an additional $17 million during the five-year period. As shown in the financial forecast on the preceding page, this new revenue plus the $21.6 million of borrowed funds should adequately provide the additional financing required. It may be noted that $3.2 million, which is 10% of the estimated construction by contract, is not provided. We believe that this is a reasonable approach based on past experience of actual, as compared to programmed, expenditures."

The finance committee stated, "We have asked the staff to proceed with the development of a suggested rate structure to accomplish the desired revenue increase, and to indicate how various classes of customers would

be affected. We expect to recommend these rates to the Board in September."

On September 16, 1969, the general manager of respondent utility district filed with the board a report and recommendation for the 1970-1974 fiscal years to the effect that the total financing required was $45.8 million. He recommended that approximately $23.3 million be borrowed and $22.5 million obtained by increased water revenues, and noted this was 24 percent more revenue than would be realized under the existing rates.

The report noted, "As to increased District water rates, it may be noted that this will be the first instance of an increase in water rates in District history, and the first rate revision of any kind since 1953 when water rates were reduced." It continued, "The District staff has developed a revised water rate structure designed to produce the needed additional revenue of $22.5 million during the period ending June 30, 1974. It is recommended that the new rates be made effective with meter reading periods commencing on and after November 1, 1969.

"The recommended rate structure is based on a method currently employed by the California Public Utilities Commission in prescribing rates for water utilities. The basic purpose of this Commission technique is to set water rates which require the water user to pay for the cost of serving that user.

"The application of the Public Utilities Commission technique would result in a rate structure so materially different from the District's existing rate structure that, in our view, it should be adopted in stages. Therefore the rate structure recommended for adoption at this time is the average of the existing rates increased by an across-the-board uniform percentage and the rates determined by the P.U.C. method."

A public hearing upon this report and recommendation of the general manager was held on October 14, 1969, and various persons, including petitioner, appeared and were heard by the board. Some argued that the proposed rate increase was too high; some argued that the present increase was all right, but future increases would not be; and petitioner argued that the rate increases were too low. After hearing the objections the board overruled and denied them and by resolution No. 24976, the report and recommendation of the general manager was accepted and approved as filed, and the recommended rates and charges were made effective November 1, 1969.

Approximately nine months later, on August 25, 1970, the board of directors enacted resolution No. 25366. They found that the revenues of

the district would not be sufficient to pay its expenses, and therefore, imposed an ad valorem property tax on all property within the district for the fiscal year beginning July 1, 1970, and ending June 30, 1971. The rate of tax was fixed at 14.7 cents per $100 assessed valuation on property located in Alameda County, and 15.6 cents per $100 of assessed valuation on property in Contra Costa County. A copy of the resolution establishing the tax rates was transmitted to the two counties on August 26, 1970, and one week later petitioner commenced this action.

## I

Petitioner predicates his action on the general proposition expressed in *Manjares* v. *Newton* (1966) 64 Cal.2d 365 [49 Cal.Rptr. 805, 411 P.2d 901], as follows: "That mandate will lie whenever an administrative board has abused its discretion is a rule so well established as to be beyond question." (64 Cal.2d at p. 370. See also *Sanders* v. *City of Los Angeles* (1970) 3 Cal.3d 252, 261 [90 Cal.Rptr. 169, 475 P.2d 201]; *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626, 639 [12 Cal.Rptr. 671, 361 P.2d 247]; *City and County of S.F.* v. *Boyd* (1943) 22 Cal.2d 685, 690 [140 P.2d 666]; and *McLeod* v. *Board of Pension Commissioners* (1970) 14 Cal.App.3d 23, 27 [94 Cal.Rptr. 58].) He contends that the provisions of section 12809 (fn. 1 above) require the district to fix rates and charges for water which will render the district self-supporting, that the board failed to perform a duty imposed by law by setting the rates too low, and that the resulting tax is therefore illegal.

The trial court found that petitioner had an adequate remedy at law for the recovery of his taxes, and that he failed to avail himself of it. Sections 5136-5138 of the Revenue and Taxation Code provide for the payment of taxes under protest and for actions to recover such sums. Sections 5096 and 5099 authorize the refund of taxes which are found to be erroneously or illegally collected. It is generally held that these provisions preclude any attack on the legality of a tax by way of a writ of mandamus because the legal remedy of paying the tax under protest and seeking a refund is adequate. (See *Star-Kist Foods, Inc.* v. *Quinn* (1960) 54 Cal.2d 507, 511-512 [6 Cal.Rptr. 545, 354 P.2d 1]; *Security-First Nat. Bk.* v. *Bd. of Supervisors* (1950) 35 Cal.2d 323, 327 [217 P.2d 948]; *Vista Irr. Dist.* v. *Board of Supervisors* (1948) 32 Cal.2d 477, 478 [196 P.2d 926]; *Sherman* v. *Quinn* (1948) 31 Cal.2d 661, 665 [192 P.2d 17]; *Tivens* v. *Assessment Appeals Bd.* (1973) 31 Cal.App.3d 945, 947-948 [107 Cal.Rptr. 679]; and *Jillson* v. *Board of Supervisors* (1963) 221 Cal.App.2d 192, 194-195 [34 Cal.Rptr. 419]. Cf. *Lockhart* v. *Wolden* (1941) 17 Cal.2d 628, 633 [111 P.2d 319]; *Eisley* v. *Mohan* (1948) 31 Cal.2d 637, 640-642 [192 P.2d 5];

and *People* v. *Superior Court* (1970) 13 Cal.App.3d 672, 676 [91 Cal.Rptr. 651].) In *Sherman* v. *Quinn, supra,* the court stated, ". . . an adequate procedure is provided by statute whereby taxes erroneously levied and collected may be refunded, together with interest therein, upon a claim therefor. [Citations.]" (31 Cal.2d at p. 665.) The court also observed, " 'The prompt payment of taxes is always important to the public welfare. It may be vital to the existence of a government. The idea that every taxpayer is entitled to the delays of litigation is unreason.' (*Springer* v. *United States,* 102 U.S. 586, 594 . . . , cited with approval in *People* v. *Skinner,* 18 Cal.2d 349, 355 . . .)" (*Id.*)

Petitioner seeks to avoid the effect of the foregoing decisions on several grounds. He points out that no action at law will lie to force the district to increase its water charges and rates as he contends the statute requires it should, and that therefore the interrelation between the water rates and the tax rates warrants an action by application for an extraordinary writ. Secondly, he contends that the limiting doctrine does not apply where the entire levy is invalid, and that a class action will be entertained, when, as here, the amount involved with each taxpayer is small.

In *Lockhart* v. *Wolden, supra,* an assessment which disregarded the right of a woman to a veteran's constitutionally provided exemption was ordered canceled on a petition for writ of mandamus. The court opined that the legal remedy was inadequate because at that time no interest could be recovered in an action for refund of a wrongfully collected tax. (17 Cal.2d at p. 633.) In *Star-Kist Foods, Inc.* v. *Quinn, supra,* however, the court clearly indicated that the *Lockhart* case should not be followed since interest could be recovered under provisions subsequently enacted in section 5141 of the Revenue and Taxation Code (54 Cal.2d at p. 512).

In *Lockhart* the court also noted, "Though we recognize that the interest item upon this particular assessment is small, it becomes very substantial when the rights of taxpayers situated similarly to petitioner are taken into consideration. Any other procedure would involve a multiplicity of suits, for the question as to the right to the exemption here claimed by petitioner applies to other women veterans in California—petitioner alleges there are approximately two thousand—in the same way as to petitioner. Thus this situation appears to be of considerable public importance, and the fact that complete and final relief may be given to this group of taxpayers by the issuance of a single writ further fortifies petitioner's argument supporting the propriety of this particular proceeding." (17 Cal.2d at p. 633.) Petitioner asserts that this language has not been overruled and authorizes the use of a writ of mandamus in this case where a vast group of taxpayers

is affected. (Cf. *Knoff* v. *City etc. of San Francisco* (1969) 1 Cal.App.3d 184, 199 [81 Cal.Rptr. 683]; and *People* v. *Superior Court, supra,* 13 Cal.App.3d 672, 676.) He contends that the recognition of the benefits of class litigation (see *Vasquez* v. *Superior Court* (1971) 4 Cal.3d 800, 807-810 [94 Cal.Rptr. 796, 484 P.2d 964]; and *Beckstead* v. *Superior Court* (1971) 21 Cal.App.3d 780, 783-784 [98 Cal.Rptr. 779]), and the extension of the right of a taxpayer to bring an action to restrain illegal expenditures or other illegal action by a governmental body (see Code Civ. Proc., § 526a; *Blair* v. *Pitchess* (1971) 5 Cal.3d 258, 267-269 [96 Cal.Rptr. 42, 486 P.2d 1242, 45 A.L.R.3d 1206]; *Knoff* v. *City etc. of San Francisco, supra,* 1 Cal.App.3d 184, 198-199; *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77, 92 [35 Cal.Rptr. 450]; and *Schaefer* v. *Berinstein* (1956) 140 Cal.App.2d 278, 289 [295 P.2d 113]), demonstrate that the action for a writ of mandamus should be entertained in this case.

■ It is unnecessary to determine to what extent an exception should be made to the general rule that the existence of an action at law to recover a refund precludes resort to an extraordinary writ to attack the alleged illegal or erroneous levy of a tax. The public policy in preserving the fiscal integrity of the government so it will not grind to a halt is strong. In this case, however, the taxpayer did not seek to deprive the district of its revenues. In one action he was attempting to secure an order directing the district to secure the necessary funds in the manner he contends the law provides. For this reason, the interrelation of the tax rate and the rates for charges for water, the petition properly should have been maintained.

## II

■ The record reflects that after the action was commenced the taxes were collected and paid over to the district. At the time of trial it would have been impossible to delete or cancel the levy for the 1970-1971 fiscal year. In *Treber* v. *Superior Court* (1968) 68 Cal.2d 128, the court concluded: ". . . it has been judicially established that the applicant for a writ of mandate must also show that the respondent has a *present* duty to perform the act he seeks to compel. [Citation.] Although this rule is most commonly invoked in denying an application to compel the performance of future acts [citations], it is equally applicable to acts which it is too late to perform [citation]. Thus mandate does not lie when the respondent no longer has the legal authority to discharge the alleged duty because the time for doing so, as specified by statute or ordinance, has expired. [Citations.]" (68 Cal.2d at p. 134. See also *Stracke* v. *Farquar* (1942) 20 Cal.2d 82 [124 P.2d 9]; *Rice* v. *McClellan* (1927) 202 Cal. 650, 654 [262 P.

1092]; 5 Witkin, Cal. Procedure (2d ed. 1971) Extraordinary Writs, § 67, pp. 3845-3846; and Cal. Civil Writs (Cont.Ed.Bar 1970, No. 47) p. 77.)

Petitioner urges that the foregoing precedent should not be deemed controlling because the court in this action could order the district to refund the alleged illegally levied and collected taxes to the taxpayers within the district. The respondents contend that the sums collected have been consumed by expenses occurred in the operations of the district. Petitioner asserts that so far as the record is concerned, the district ended up its operations for the fiscal year 1970-1971 with a sum approximately equal to that allegedly erroneously collected from the taxpayers, and that, in any event, the court could order an increase in rates to pay the tax refunds and thereby place the burden of the operations on the users where it should be under applicable law.

In support of his views, the petitioner relies upon an analogy to section 4986 of the Revenue and Taxation Code which since 1970 (Stats. 1970, ch. 129, § 3, p. 357) has empowered a board of supervisors to cancel an erroneous assessment whether the taxes have been collected or not. He also refers to *City of Los Angeles* v. *Public Utilities Commission* (1972) 7 Cal. 3d 331 [102 Cal.Rptr. 313, 497 P.2d 785], in which the reviewing court, on finding a rate increase invalid, ordered the utility to refund the increased amounts collected to its customers (7 Cal.3d at p. 359). In this case, however, it is too late to unscramble the eggs. There is no true surplus from the total amount collected by taxes and water charges for the overall long run operations of the district. Petitioner has conceded, "Respondent is correct insofar as it has no authority to alter retrospectively the 1970-1971 water rates, or to adjust the tax rates for fiscal year 1970-1971." Any attempt to readjust at this time by increase in the water rates would not insure that the 1970-1971 users, who enjoyed lower rates by reason of the tax revenues, would pay. It would be current consumers who would be penalized. It is concluded that the matter is moot insofar as awarding tangible relief to the petitioner, and those he purports to represent, is concerned.

On the other hand, petitioner is on firmer ground when he seeks to preserve jurisdiction because the matter involves the construction of a statute of statewide import, because the question of the extent to which taxes may be resorted to for the support of the operations of a municipal utility district is an ongoing one, because the respective rights and obligations of the consumers and property owners within such districts are involved, and because a failure to resolve the substantive questions presented in this action will but lead to further litigation. Under these circumstances

the proceedings should not be dismissed but should be adjudicated on the merits. (See *Ballard* v. *Anderson* (1971) 4 Cal.3d 873, 876-877 [95 Cal. Rptr. 1, 484 P.2d 1345, 42 A.L.R.3d 1392]; *Diamond* v. *Bland* (1970) 3 Cal.3d 653, 657 [91 Cal.Rptr. 501, 477 P.2d 733] [cert. den. (1971) 402 U.S. 988 (29 L.Ed.2d 153, 91 S.Ct. 1661), reh. den. (1971) 404 U.S. 874 (30 L.Ed.2d 120, 92 S.Ct. 27)]; and *Kirstowsky* v. *Superior Court* (1956) 143 Cal.App.2d 745, 749 [300 P.2d 163].) It is, therefore, concluded that the proceedings should not be dismissed because they are moot.

## III

■ In exercising its rate-making power under section 12809 the board was acting in a legislative capacity. " 'A legislative act is said to be one which predetermines what the law shall be for the regulation of future cases falling under its provisions, while a judicial act is a determination of what the law is in relation to some existing thing done or happened.' (*Wulzen* v. *Board of Supervisors,* 101 Cal. 15, 24 . . .) The fixing or refixing of rates for a public service is legislative, or at least quasi legislative. [Citations.]" (*City Council* v. *Superior Court* (1960) 179 Cal.App.2d 389, 393 [3 Cal. Rptr. 796]. See also *Wilson* v. *Hidden Valley Mun. Water Dist.* (1967) 256 Cal.App.2d 271, 286-288 [63 Cal.Rptr. 889].) ■ The parties agree that the legislative action of a local agency is subject to review to determine whether the agency's action has been arbitrary, capricious, entirely lacking in evidentiary support, or otherwise unlawful. (*Pitts* v. *Perluss* (1962) 58 Cal.2d 824, 833 [27 Cal.Rptr. 19, 377 P.2d 83]. See also *Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 137, fn. 2 [93 Cal.Rptr. 234, 481 P.2d 242]; *Wilson* v. *Hidden Valley Mun. Water Dist., supra,* at p. 286; *Bowles* v. *Antonetti* (1966) 241 Cal.App.2d 283, 286-287 [50 Cal.Rptr. 370]; *Emby Foods, Inc.* v. *Paul* (1964) 230 Cal.App.2d 687, 694 [41 Cal.Rptr. 365]; and *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594, 605 [241 P.2d 283].)

Although section 12891 (see fn. 2) purports to give broad powers to tax, that power is not unlimited. In *In re Williams* (1934) 137 Cal.App. 444 [30 P.2d 591], the court struck down the levy of a license tax to provide funds for a public utility district. The court stated, "It plainly appears that no one of the subdivisions of section 30 [Stats. 1921, ch. 560, p. 906, at § 30, p. 918, precursor of § 16641] is intended to be an absolute grant of power in itself, but that each is intended to be taken in connection with the others and with the other sections of the act." (137 Cal.App. at p. 446.) In levying the taxes involved here the board found, as is required by section 12892 (fn. 2 above), that the revenues from rates and charges would not be sufficient for any and all lawful purposes of the district. This finding

is not directly challenged. It is attacked because the board at that time, August 25, 1970, did not make a finding that it was not possible to fix rates and charges which would produce revenues that would render the utility self-supporting and suffice to meet all lawful purposes without making such rates and charges unreasonably high (see § 12809, fn. 1 above), or, more specifically, as urged by petitioner, without making such rates and charges high as compared with prices for water generally. Respondents rely upon the earlier action of the board, October 14, 1969, when the rates and charges were fixed after public hearing. Attention is therefore directed to those proceedings.

In *Sacramento Municipal Util. Dist.* v. *Spink* (1956) 145 Cal.App.2d 568 [303 P.2d 46], when the court upheld the power of a municipal utility district to issue revenue bonds payable from the revenues from charges for services, it parenthetically noted, "the general rule set forth in section 12809 is that the utility should be self-supporting." (145 Cal.App.2d at p. 581.) Nevertheless, under the express terms of section 12809 ". . . large expenditures and the interest thereon required for future needs and developments" need not be covered by revenues from notes and charges. In *Spink* the court observed with respect to the fact that the municipal utility district might incur an obligation for taxes upon facilities located out of the district boundaries, "The district has the power to increase its revenues to meet any increase in costs by an increase in its rates (Pub. Util. Code, § 12809) or by a levy of taxes (Pub. Util. Code, § 12892)." (145 Cal.App. 2d at p. 580.)

In *Engineering etc. Co.* v. *East Bay M.U. Dist.* (1932) 126 Cal.App. 349 [14 P.2d 828], the court construed the taxing power of a municipal utility district under an earlier statute. (Stats. 1921, ch. 218, § 18, p. 257.[4]) The court upheld the exercise of the taxing power to meet substantial initial costs incurred in acquiring a private water company and noted,

---

[4]This section read in pertinent part: ". . . Only revenue producing utilities shall be acquired, owned or operated by a district formed under the provisions of this act. So far as possible the board of directors shall fix such charges for commodities or service furnished by any revenue producing utility, as will pay the expenses of the government of the district, including salaries, office expenses, and other necessary disbursements; the operating expenses of the utility; the interest on any bonded indebtedness incurred for the acquisition, construction and completion thereof; and provide a sinking or other appropriate fund for the payment of the principal of such debt as it may become due, and also provide an appropriate fund for repairs, replacements and betterments; it being the intention of this section that the district pay all of such charges and expenditures, and the interest and principal of its bonded debt, from the revenues derived by the district from the operation of its public utilities, and that each public utility owned and operated by the district shall be self-sustaining." (Stats. 1921, ch. 218, § 18, p. 257.)

". . . as a general proposition the power of taxation is regarded as a most important and essential attribute of a public corporation or utility in order that there may be the ability to function generally and freely under exigencies and situations that may present themselves; and unless the exercise of such power is in the clearest of terms prohibited, it is never denied. [Citations.]" (126 Cal.App. at pp. 365-366.) The court further commented, "Nor can it be thought that it was the intention or within the contemplation of the legislature that the fact that the district needed the money or that it was under the necessity of raising money in a given amount should be considered as the controlling factor in fixing or setting a price or rate for the water which it was called upon to distribute to its patrons and that *any question of the reasonableness or fairness of such set price, relatively speaking, as compared with prices for water generally, should be ignored and disregarded.* A fair market value or fair service value is not generally regarded as being dependent upon mere financial necessity or exigency, or as being such as will satisfy such necessity or exigency." (*Id.*, p. 366, italics added.)

From the latter passage petitioner evolves a rule "that a property tax levy is permissible under the statute only if the rates which would be required to make the District self-supporting would be unreasonably high compared to water prices generally." The case does not support that conclusion, first, because a mandate not to ignore or disregard the prices for water generally in fixing or setting a reasonable and fair price or rate for the district's water is not a command that the only reasonable or fair price is the comparable price; and, second, because the statute, which then read substantially as now found in section 16467 of the Public Utilities Code, relating to public utility districts (see fns. 4 above and 5 below), has been amended several times, culminating in its present text as found in section 12809. (Stats. 1941, ch. 321, § 32, p. 1503.)

For the reason last stated the legislative intention as embodied in section 16467[5] is not governing with respect to the provisions of section 12809.

---

[5]Section 16467 provides with respect to public utility districts (Pub. Util. Code, div. 7, §§ 11501-18055) as follows: "Only revenue producing utilities shall be acquired, owned, or operated by a district. So far as possible the board shall fix such charges for commodities or service furnished by any revenue producing utility as will pay all of the expenses of the government of the district, or such portion as the board determines justly apportionable to such utility. The expenses to be paid include: [¶] (a) Salaries, office expenses, and other necessary disbursements. [¶] (b) The operating expenses of the utility. [¶] (c) The interest on any indebtedness incurred for the acquisition, construction, and completion of the utility. [¶] (d) Provisions for a sinking or other appropriate fund for the payment of the principal of such debt as it becomes due. [¶] (e) Provisions for an appropriate fund for repairs, replacements, and betterments. [¶] It is the intention of this section that a district pay all of such

Therefore, the pronouncements found in *In re Orosi Public Utility Dist.* (1925) 196 Cal. 43, at page 59 [235 P. 1004], or in similar cases under the Public Utility District Act, are not controlling in this case. The amendments of the Municipal Utility District Act indicate a different legislative intent. (See *Lambert* v. *Conrad* (1960) 185 Cal.App.2d 85, 95 [8 Cal. Rptr. 56].)

Nor do the prevailing wage cases apply to the provisions involved in the fixing of the rates and charges at issue in this case. In *Walker* v. *County of Los Angeles* (1961) 55 Cal.2d 626 [12 Cal.Rptr. 671, 361 P.2d 247] the court found an abuse of discretion because there had been a failure to comply with charter provisions requiring the county to ascertain the prevailing wages and salaries in private industry for the purpose of fixing the wage rates for county employees. (55 Cal.2d at pp. 633-636. See also *Sanders* v. *City of Los Angeles, supra,* 3 Cal.3d 252, 262; and *City and County of S.F.* v. *Boyd, supra,* 22 Cal.2d 685, 690.) ■ The course provided by those beacons fails to furnish a path to the solution of this case because the mandate to fix rates and charges so that the revenues shall enable the utility to be self-supporting, unless the board finds the rates unreasonably high, is not, as contended by petitioner, a command to fix the rates and charges according to prevailing rates and charges for water.

## IV

From the foregoing it is clear that the statute did not require the board to fix rates consistent with prices for water generally prevalent in other areas. Nevertheless, petitioner is entitled to show that the board had no evidence before it that the rates and charges higher than those fixed in October 1969, would be unreasonably high. ■ In the recommended financing plan dated April 2, 1969, which led to the rates fixed in October 1969 and the taxes levied in August 1970, it was proposed, as emphasized in the statement of facts above, that the portion of the total district costs applicable to fire protection should be borne by the taxpayers rather than the water consumers. Petitioner seizes upon this declaration as showing not only that the board disregarded comparable water prices, but also arbitrarily evaded the statutory mandate that the rates and charges should be fixed so as to produce revenues which would make the district, so far as possible, self-supporting.

In *San Leandro* v. *Railroad Commission* (1920) 183 Cal. 229 [191

charges and expenditures and the interest and principal of its debt from the revenues derived by the district from the operation of its public utilities, and that each public utility owned and operated by a district shall be self-sustaining."

P. 1], the court upheld rulings of the commission which prohibited private utilities from including in their rate structure for consumers the costs of operating and maintaining facilities for emergency demands of the public such as for extinguishing fires and flushing sewers. It approved the practice of charging such costs to the municipalities themselves, who, in turn, would raise the necessary revenue by taxation. (See 183 Cal. at pp. 235-236.) Petitioner observes that that precedent, enunciated one year before the Legislature provided for the creation of municipal utility districts and in a case involving a private utility, cannot bind the parties here. The question, however, is not whether the district was bound to raise such costs by taxation directly, without billing the municipalities who enjoyed the existence of such facilities, but whether the board could consider that the inclusion of such costs in the general rates and charges to private consumers would make the latter rates and charges unreasonably high. It not only is not arbitrary nor capricious to so conclude, but it would be unreasonable, under petitioner's theory of comparative rates, to require the district's consumers to bear the costs of fire protection while at the same time permitting, if not ordering, the private water companies to indirectly collect such costs from the taxpayers through charges to the municipalities.

Petitioner also urges that the portion of the general manager's report and recommendation quoted above demonstrates that the board was expressly digressing from the Public Utilities Commission policy "to set rates which require the water user to pay for the cost of serving that user," and by the same token was violating the statutory mandate of self-sufficiency. The fact that the board accepted the recommendation that the rate structure be adjusted to the foregoing principle in stages does not necessarily indicate that an attempt to do so in one jump would not have resulted in rates that were unreasonably high for the district. It is true that the failure to follow the statutory mandate in the past should not excuse further dereliction. Yet on the other hand the board in its discretion could well determine that a violent change in the rate structure would create unreasonably high rates within the district itself and cause dislocations which would affect all consumers.

Finally it should be noted that the trial court found, "The record of the hearings of Respondent's Board on the setting of Respondent's water rates and the fixing of Respondent's tax rates amply discloses that Respondent's Board had substantial evidence before it to support its decision both as to the water rate and the tax rate." In their answer respondents alleged that at the hearing on rates October 14, 1969, "the District's General Manager presented evidence both oral and in writing concerning the recommendations for increased water rates heretofore filed with the Board,

including a discussion of rates charged by other water utilities. Petitioner appeared and testified, and eight other persons appeared, some of the latter protesting the proposed rate increase as being too high, others saying it was acceptable but that further increases would not be. Two letters by water consumers within the District were presented to the Board protesting the proposed rate increase as being too high, a copy of said letters being attached to this answer, labeled Exhibit 'E' and incorporated by reference. After a full, fair and complete hearing, the Board accepted and approved the Report and Recommendation of the General Manager, found that such rates were reasonable, and fixed and established said rates to be effective November 1, 1969." If there was "a discussion of rates charged by other water utilities" the district cannot be charged with having ignored or disregarded comparative rates.

Code of Civil Procedure section 1091 provides, "On the trial, the applicant is not precluded by the return from any valid objection to its sufficiency, and may countervail it by proof either in direct denial or by way of avoidance." Under this section it is held that the failure to controvert the factual allegations of the answer permits the trial court to accept them as true. (See *California Portland Cement Co.* v. *State Bd. of Equalization* (1967) 67 Cal.2d 578, 582, fn. 5 [63 Cal.Rptr. 5, 432 P.2d 700]; *Hunt* v. *Mayor & Council of Riverside* (1948) 31 Cal.2d 619, 623 [191 P.2d 426]; *Lotus Car Ltd.* v. *Municipal Court, supra,* 263 Cal.App.2d 264, 268-269; *Most* v. *First Nat. Bank of San Diego* (1966) 246 Cal.App. 2d 425, 432 [54 Cal.Rptr. 669]; *Day* v. *City of Los Angeles* (1961) 189 Cal.App.2d 415, 418 [11 Cal.Rptr. 325]; and *Kimberlin* v. *L.A. City High School Dist.* (1953) 115 Cal.App.2d 459, 464 [252 P.2d 344].) As has already been noted, petitioner's offer of proof concerning comparable rates was properly rejected because it attempted to introduce extrinsic evidence. Although the record shows that petitioner was present at the rate hearing, and in fact addressed the board to complain of the low rates, he did not at the trial offer to prove that the quoted allegations of the answers were false. The allegations therefore sustain the findings which petitioner now attacks.

■ Evidence Code section 664 provides in part: "It is presumed that official duty has been regularly performed. . . ." (See *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77, 95.) This presumption affects the burden of proof and placed the burden on the petitioner to show that such duty was not regularly performed. (See Evid. Code, §§ 605-606.) "When the right to enact a law depends upon the existence of a fact, the passage of the act implies, and the conclusive presumption is, that the Legislature performed its duty and ascertained the existence of the fact

before enacting and approving the law—a decision which the courts have no right to question or review. [Citations.]" *(Porter* v. *City of Riverside, supra,* 261 Cal.App.2d 832, 836. See also *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d at p. 95.)

This is not a case where there is "indisputable proof from the board's own records that it did not in fact ascertain" that higher rates would be unreasonably high. (Cf. *Walker* v. *County of Los Angeles, supra,* 55 Cal. 2d 626, 636.) Nor is it a case where any action taken—in fixing the rates and levying the taxes—"shows on its face or in its results an improper purpose, motive or intent." (Cf. *Trujillo* v. *City of Los Angeles* (1969) 276 Cal.App.2d 333, 338 [81 Cal.Rptr. 146].) Petitioner's attempt to show bad faith, by comparing the results of the action fixing the rates with rates charged by other purveyors of water, founders because the vessel in which it is embarked—his interpretation of the statute—is not sustained by the law.

The judgment is affirmed.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied September 23, 1974, and the opinion was modified to read as printed above. Appellant's petition for a hearing by the Supreme Court was denied October 30, 1974.