[No. E007838. Fourth Dist., Div. Two. May 23, 1991.]

GOLDEN CHEESE COMPANY OF CALIFORNIA et al., Plaintiffs and Appellants, v.
HENRY J. VOSS, as Director, etc., et al., Defendants and Respondents;
FARMDALE CREAMERY, INC., et al., Interveners and Appellants;
WESTERN UNITED DAIRYMEN et al., Interveners and Respondents.

## Counsel

Gibson, Dunn & Crutcher, Richard G. Duncan, Jr., Edward L. Xanders, Chapman, Fuller & Bollard, Jeffrey A. Robinson, William C. Bollard, Senn, Lewis, Hoth & Strahle and Mark A. Senn for Plaintiffs and Appellants.

Emil Steck, Jr., as Amicus Curiae on behalf of Plaintiffs and Appellants.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, R. H. Connett, Assistant Attorney General, and Douglas B. Noble, Deputy Attorney General, for Defendants and Respondents.

Best, Best & Krieger, Virginia A. Ettinger and David Prentice for Interveners and Appellants.

Hanson, Bridgett, Marcus, Vlahos & Rudy, John J. Vlahos, Robert L. Rusky and Larry A. Rosenthal for Interveners and Respondents.

OPINION

HOLLENHORST, Acting P. J.—This case tests the validity of an amendment to certain milk marketing plans issued by the director of the Department of Food and Agriculture on July 14, 1989, effective August 1, 1989. Appellants Golden Cheese Company of California, Integrated Protein Technology, and Leprino Foods Company filed a petition for writ of mandate to invalidate the amendment. The trial court declined to grant the writ, and they appeal.

This court has recently decided a case entitled *Golden Cheese Co.* v. *Parnell* (E006841, herein *Parnell*) in which Golden Cheese Company challenged the validity of a prior order of the director dated December 19, 1988, effective January 1, 1989. In that decision, this court reversed the trial court's granting of a writ of mandate.

This case presents several closely related legal issues in a different factual context. We therefore adopt some portions of the prior opinion and we consider whether the director's new factual determinations have any evidentiary support.

## THE STATUTORY SCHEME[1]

Milk is a product that has long been regulated by statute. (Food & Agr. Code, § 61301 et seq.[2] ■ "As has often been reiterated, the purpose of the Milk Stabilization Act is to eliminate unfair, unjust, destructive and demoralizing trade practices in the producing, marketing, sale, processing or distribution of milk which tend to undermine regulations and standards of the content and purity. . . . Both the statute and cases underline that the terms and conditions governing the production and distribution of milk shall be such as will insure in the several localities and markets of the state an adequate and continuous supply of pure, fresh, wholesome fluid milk to the consumers at fair and reasonable prices [citations]. The all pervasive end of the act is that ' "the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the marketing area." ' " (*E. M. Consumer Corp.* v. *Christensen* (1975) 47 Cal.App.3d 642, 647 [121 Cal.Rptr. 177].) The statutory scheme is constitutional. (*Jersey Maid Milk Products Co.* v. *Brock* (1939) 13 Cal.2d 620 [91 P.2d 577]; *Ray* v. *Parker* (1940) 15 Cal.2d 275 [101 P.2d 665]; *Knudsen Creamery Co.* v. *Brock* (1951) 37 Cal.2d 485; Annot. (1945) 155 A.L.R. 1383 [234 P.2d 26].)

This case concerns section 61801 et seq. (ch. 2) entitled "Stabilization and Marketing of Market Milk." Under this chapter, the Director of Food and Agriculture (§ 102) is authorized to establish marketing areas, and stabilization and marketing plans for those areas. The director also determines "minimum prices to be paid to producers by handlers for market milk which are necessary due to varying factors of costs of production, health regulations, transportation, and other factors in the marketing areas of this state." (§§ 61801-61812.)

The director is authorized to adopt stabilization and marketing plans after hearing (§§ 61991-61996), and to amend those plans (§§ 62031-62032). "Each stabilization and marketing plan shall contain provisions whereby the director establishes minimum prices to be paid by handlers to producers for market milk in various classes. The director shall establish the prices by designating them in the plan, or by adopting methods or formulas in the plan whereby the prices can be determined, or any combination of the foregoing. . . . If the director adopts methods or formulas in the plan for designation of prices, the methods or formulas shall be reasonably calculated to

---

[1]This section of the opinion is repeated from the opinion in the *Parnell* case.
[2]Unless otherwise indicated, all further statutory references are to the Food and Agriculture Code.

result in prices which are in a reasonable and sound economic relationship with the value of milk used for manufacturing purposes." (§ 62062.)[3]

## BACKGROUND

In *Parnell*, we explained that the pricing formula historically used by the director for class 4 milk was a formula that based the minimum price of market milk used for class 4b purposes (cheese manufacture) on the formula used for class 4a purposes (butter and nonfat milk powder manufacture). The December 1988 modification to the marketing plan was an interim formula that incorporated a "cheese mover" index into the formula. This index was intended to allow milk producers to enjoy increased prices for their milk as the index moved above the federal support price. Nevertheless, there was then general agreement that a new class 4b formula should be adopted which was separate from the class 4a formula and which was based on costs and other factors specific to cheese manufacture. The August 1, 1989, formula under review in this case was intended to be the new cheese specific formula.

## THE ADMINISTRATIVE DECISION

An administrative hearing was held on June 27-28, 1989, to consider adoption of a new class 4b pricing formula. Twenty witnesses testified, representing milk producers, cheese manufacturers, and other segments of the dairy industry. Appellants testified, representing manufacturers of more than half of the total volume of cheese produced in California. Following the hearing, a new cheese specific pricing formula was adopted, and the department issued an economic basis statement explaining its action.

Specifically, the department decided "the time has arrived to adopt a cheese specific Class 4b price formula based on the following concepts: [¶] *Cheese price less a cheese manufacturing cost allowance, multiplied by a cheese yield, plus the value of by-products from the cheese making process.*" (Italics added.)

The previous class 4b formula, considered in *Parnell*, used a ratio of the National Cheese Exchange 40-pound block cheddar cheese price at Green Bay (NCE price) to the federal support purchase price for 40-pound block cheddar cheese (SPP price) as the "cheese mover" index to reflect the relative market value of class 4b finished products. Under the new formula,

---

[3]For a history of milk regulation, see California Farm and Ranch Law (Cont.Ed.Bar 1967) sections 7.56-7.65, pages 269-275.

the index is retained but the cheese price component of the new formula is based on the SPP price.[4] The economic basis statement explains this change: "Testimony was divided over whether to use the NCE price or the SPP as the price to reflect finished product value in a cheese specific formula. The SPP is an actual market price, while the NCE price is an indicator of market movement. After reviewing and considering all data and testimony, it was determined that SPP should be adopted to reflect the finished product price in calculating the base 4b hundredweight price."

Next, the department decided to adjust the SPP price by a moisture adjustment. It found that the SPP price is based on cheddar cheese having a moisture content of 39 percent, that SPP posted prices are increased for cheese with moisture less than 39 percent, and that the moisture in California cheddar cheese ranges from 35.93 percent to 38.16 percent. The department therefore adopted a moisture level of 36.7 percent, and increased the SPP price accordingly. Appellants vigorously attack this determination.

The department then adopted the manufacturing cost allowance (also called a "make allowance") component of the formula. The department considered the results of its own studies of the costs of manufacturing cheese in California, United States Department of Agriculture (USDA) cost data, class 4a manufacturing cost allowances, and other cost analyses. The department decided that "[after] reviewing and considering all data and testimony, it was determined that a manufacturing cost allowance of 19.5 cents per pound of cheese is reasonable and should be adopted. This allowance will cover reasonably efficient plants. It is unreasonable to set a higher manufacturing cost allowance both because the resulting reduced Class 4b price would no longer be in reasonable and economic sound relation to producer costs and because it would no longer result in reasonable price relationships among the various classes of milk, especially the relationship between Classes 4a and 4b." The department expressly refused to include the three highest cost cheese plants in the "reasonably efficient plants" group. Appellants contest this determination.

The cheese yield component of the formula was set by adoption of a yield factor "for reasonably efficient California plants" within the range of actual cheese yields for California plants studied by the department.

The department also considered whether to have a lower limit on the class 4b price. The department found that, since California cheese is primarily

[4]More precisely, the formula's first component is a base hundredweight price that is computed by taking the SPP price, multiplying it by a moisture adjustment factor of 1.0377, and subtracting the cheddar cheese manufacturing cost allowance of $.0195. The result is multiplied by a cheese yield factor of 9.8. An adjusted base hundredweight price is then computed by adding the former "cheese mover" index price and a by-products allowance.

sold in the commercial market, a lower limit should not be adopted. Appellants supported this decision.

The value of by-products was set by using a reported price for whey butter, less a manufacturing allowance. It was assumed that the cost of manufacturing by-products other than whey cream is equal to the income from sale of such products.

The department's economic basis statement finds that this formula "gives the best measure of the value of milk used in manufacturing cheese and explicitly takes into account market prices, manufacturing costs and yields for both cheese and whey butter."

## SCOPE OF REVIEW

■ "In promulgating minimum price orders, the director acts in quasi-legislative capacity and is, therefore, vested with broad discretion. The establishment of minimum prices involves highly technical matters requiring the assistance of skilled and trained experts and economists and the gathering and study of large amounts of statistical information. [¶] If the minimum price order is promulgated pursuant to the procedures provided by law, it must be sustained unless the director's action has been arbitrary, capricious or entirely lacking in evidentiary support." (*Emby Foods, Inc.* v. *Paul* (1964) 230 Cal.App.2d 687, 693-694 [41 Cal.Rptr. 365].)

■ "In an action of this character challenging proceedings and hearings of the type here involved, it is not for the courts to *weigh* the evidence and data adduced before and considered by the director preliminary to his issuance of the several orders here challenged. Under the circumstances here present, judicial interference should occur only when it can be said that administrative action has been arbitrary and capricious." (*Ray* v. *Parker*, *supra*, 15 Cal.2d 275, 310-311; *Knudsen Creamery Co.* v. *Brock*, *supra*, 37 Cal.2d 485, 494; *E. M. Consumer Corp.* v. *Christensen*, *supra*, 47 Cal.App.3d 642, 648.)

■ "Judicial review of a quasi-legislative action is limited to ordinary mandamus, in which review is confined to an examination of the agency proceedings to determine whether the action taken is arbitrary, capricious or entirely lacking in evidentiary support, or whether it failed to conform to procedures required by law . . . ." (8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, § 250, pp. 873-874; *Brock* v. *Superior Court* (1952) 109 Cal.App.2d 594 [241 P.2d 283].)

■ Our Supreme Court has held: "In considering the scope or nature of appellate review in a case of this type we must keep in mind the fact that the

courts are examining the act of a coordinate branch of the government—the legislative—in a field in which it has paramount authority, and not reviewing the decision of a lower tribunal or of a fact-finding body. Courts have nothing to do with the wisdom of laws or regulations, and the legislative power must be upheld unless manifestly abused so as to infringe on constitutional guaranties. The duty to uphold the legislative power is as much the duty of appellate courts as it is of trial courts, and under the doctrine of separation of powers neither the trial nor appellate courts are authorized to 'review' legislative determinations. The only function of the courts is to determine whether the exercise of legislative power has exceeded constitutional limitations. As applied to the case at hand, the function of this court is to determine whether the record shows a reasonable basis for the action of the zoning authorities, and, if the reasonableness of the ordinance is fairly debatable, the legislative determination will not be disturbed." (*Lockard* v. *City of Los Angeles* (1949) 33 Cal.2d 453, 461-462 [202 P.2d 38, 7 A.L.R.2d 990]; *Credit Ins. Gen. Agents Assn.* v. *Payne* (1976) 16 Cal.3d 651 [128 Cal.Rptr. 881, 547 P.2d 993], quoting *Ralphs Grocery Co.* v. *Reimel* (1968) 69 Cal.2d 172, 175 [70 Cal.Rptr. 407, 444 P.2d 79]; *Eye Dog Foundation* v. *State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 544-545 [63 Cal.Rptr. 21, 432 P.2d 717].)

■ We therefore decide questions of statutory interpretation as questions of law. Factual matters are reviewed to determine if the director's action was arbitrary, capricious, or entirely lacking in evidentiary support. (*Emby Foods, Inc.* v. *Paul, supra,* 230 Cal.App.2d 687, 693-694.)

### ALLEGED VIOLATION OF SECTION 62062

The fundamental contention of appellants is that the director violated the provisions of section 62062. That section, quoted in full in the footnote,[5]

---

[5]Section 62062: "Each stabilization and marketing plan shall contain provisions whereby the director establishes minimum prices to be paid by handlers to producers for market milk in the various classes. The director shall establish the prices by designating them in the plan, or by adopting methods or formulas in the plan whereby the prices can be determined, or any combination of the foregoing. If the director directly designates prices in the plan, the prices shall be in reasonable and sound economic relationship with the value of milk used for manufacturing purposes. If the director adopts methods or formulas in the plan for designation of prices, the methods or formulas shall be reasonably calculated to result in prices which are in a reasonable and sound economic relationship with the value of milk used for manufacturing purposes.

"In establishing the prices, the director shall take into consideration any relevant economic factors, including, but not limited to, the following:

"(a) The reasonableness and economic soundness of market milk prices in relation to the cost of producing and marketing market milk for all purposes, including manufacturing

establishes the standards used by the director in setting minimum prices. Appellants contend that the director violated this section by failing to take into consideration the adequacy of the cheese supply, by not setting prices that are reasonably related to the value of milk used to manufacture cheese, by arbitrarily setting the moisture allowance and the make allowance, by arbitrarily determining what is a "reasonably efficient plant," and by arbitrarily adopting the yield factor.

█ Before considering appellants' attack on the formula itself, we first consider the more general contention that the director violated section 62062, subdivision (b) by failing to recognize his alleged responsibility to assure a continuous availability of an adequate supply of cheese to the consuming public.

Appellants contend that the purpose of the stabilization and marketing laws, and particularly sections 62062, 61801, 61802, 61828 and 61835, is not to protect or favor milk producers, but rather is to protect the supply of milk, and products made from milk, to the consumer. Under this argument, both the production of milk and the processing of milk into cheese are industries affecting the public health, and both industries should be regulated to assure an adequate supply of milk and cheese to the public. Specifically, appellants contend that "the price of milk to cheese makers must be such that the cheese supply will be adequate and available to the consuming public."

Amicus curiae, the Dairy Institute,[6] echoes this theme: "Of critical importance is the novel position of the Director of Food and Agriculture that under a public interest statute such as the Milk Stabilization Act, having as its objective an adequate supply of market milk to the *consuming public*, the

purposes. In determining the costs, the director shall consider the cost of management and a reasonable return on necessary capital investment.

"(b) That prices established pursuant to this section shall insure an adequate and continuous supply, in relation to demand, of pure, fresh, wholesome market milk for all purposes, including manufacturing purposes, at prices to consumers which, when considered with relevant economic criteria, are fair and reasonable.

"(c) That the prices established by the director for the various classes of market milk bear a reasonable and sound economic relationship to each other.

"In establishing the prices, the director shall also take into consideration all the purposes, policies, and standards contained in Sections 61801, 61802, 61805, 61806, 61807, 62076, and 62077."

[6]According to amicus curiae: "Dairy Institute is a statewide, nonprofit corporation, the membership of which is composed of persons engaged in the business of processing and distributing fluid milk and manufacturing and distributing other dairy products, including cheese. Such members distribute approximately 90% of the total gallonage of all fluid milk distributed in California, approximately 85% of the total of all dairy products manufactured from milk in California, and approximately 75% of all cheese manufactured in California."

Director of Food and Agriculture, in establishing minimum prices payable to producers for market milk supplied to the consuming public as cheese, is required to be concerned with only the welfare of milk producers and not with whether the prices paid to such producers by cheese manufacturers will permit such manufacturers to supply the public need for articles of food (specifically cheese) that are manufactured from milk. Dairy Institute considers this to be a position squarely inconsistent with the purposes of the Milk Stabilization Act." Accordingly, the Dairy Institute contends that the director fails to comply with section 62062 when he fails to find in that section an obligation to insure an adequate supply of cheese to the consuming public.

Interveners-respondents contend otherwise. They argue that: "The absurdity of such statutory interpretation is apparent by listing just a few other manufactured dairy products that would thus be deemed necessary to the public health and whose supply would be protected: ice cream (§ 36861), sherbet (§ 36961), eggnog (§ 38791), cream cheese (§ 37621), [and] whipped cream (§ 38761). Appellants are wrong because section 62062(b) does not require the Director to consider the effects of pricing on the supply of various dairy products manufactured from market milk, but instead on the supply of market milk available for various purposes, including cheese-making." Similarly, interveners-respondents argue that the director's responsibility is "to stabilize and balance the entire dairy industry, and *all* the production and manufacturing sectors thereof, by insuring an adequate and continuous supply of the wellspring of that industry—fluid milk." These parties assert that, if the Legislature intended to guarantee the cheese supply, it would have expressly said so.

In *Parnell*, we rejected Golden Cheese's contention that section 62062 requires that any pricing formula have a sound economic relationship between the value of milk for cheese manufacturing purposes and the class 4b price. Based on the statutory history, we concluded that the "sound economic relationship" required is between the price of market milk and the value of milk used for manufacturing purposes.

Although the contention here is broader, our opinion is the same. As noted above, the statutory scheme of chapter 2 (§ 61801 et seq.) imposes on the director the duty "to determine minimum prices to be paid to producers by handlers for market milk . . . ." (§§ 61805, subd. (b), 61838.) A "handler" is a person who acquires market milk in unprocessed or bulk form for "the purpose of manufacture, processing, sale, or other handling . . . ." (§§ 61826, 61872.) "Processing" includes the manufacturing of milk products from market milk. (§ 61835.) The various market milk classifications (§ 61931 et seq.) divide market milk according to the uses to which it is put,

and the marketing plan establishes different minimum prices for different classes. The stabilization and marketing plan is thus focused on the price paid by handlers to producers for market milk in the various classes. While the prices set by the director should "insure an adequate and continuous supply, in relation to demand, of pure, fresh, wholesome market milk for all purposes, including manufacturing purposes . . . ." (§ 62062, subd. (b)), we find nothing in this section or in chapter 2 that requires the director to assure an adequate supply of the products which are manufactured from the market milk.

Amicus curiae finds such a requirement in the legislative purpose provisions of chapter 2. For example, it cites section 61802, subdivision (e) which states: "It is the policy of this state to promote, foster, and encourage the intelligent production and orderly marketing of commodities necessary to its citizens, including market milk, and to eliminate economic waste, destructive trade practices, and improper accounting for market milk purchased from producers." It argues that the supply of milk is the supply to the consuming public, *including supply of such milk in the form of cheese*. From this tenuous position, it contends that the director must establish a class 4b price which a preponderance of cheese manufacturers can pay consistent with their costs in order that there is assurance of a supply of cheese to the consuming public.

As noted above, we find no support in chapter 2 for this position. The chapter is directed at assuring the availability of fluid milk to the consuming public and contains no requirement that the director set fluid milk prices to assure a sufficient supply of cheese or any other manufactured product to the consuming public. While it is true that a market milk price set too high could destroy the cheese industry in California as an outlet for market milk, and thus injure the milk producers indirectly, it is the production of market milk that is the regulated industry. (§ 61801.) Thus, while the director must establish prices that insure an adequate supply of market milk for all purposes, including manufacturing purposes (§ 62062, subd. (b)), one of the purposes of chapter 2 is to "[e]nable the dairy industry . . . to develop and maintain satisfactory marketing conditions [and to] bring about and maintain a reasonable amount of stability and prosperity in the production of market milk . . . ." (§ 61805, subd. (d).)

Appellants rely on section 61828. That section defines market milk as follows: " 'Market milk' has the meaning of that term as defined in Section 32510. Unless the context otherwise indicates, the term 'market milk' includes market cream, the components and derivatives of market milk, and dairy products manufactured from market milk or its components and derivatives." Appellants contend that this section means that the term "market

milk" includes cheese. Interveners-respondents argue that the "context otherwise indicates" for the sections at issue here.

Section 32510 defines "market milk" as milk meeting the standards of sections 35751 et seq., including components and derivatives of market milk. The section then states: "Market milk may be supplied to the consumer in the fluid state or may also be utilized in the manufacture of milk products." Under this definition, market milk is something used in the manufacture of cheese—cheese is not merely milk in manufactured form. .

While the meaning of the term "market milk" can therefore vary according to context, we are convinced that appellants and amicus curiae are incorrect when they read section 62062, subdivision (b) to require the director to set milk prices to assure an adequate supply of cheese or other manufactured products. At most, as shown by its introductory language, section 62062, subdivision (b) requires the director to *consider* the effect of his or her prices on the supply of milk for all purposes, including manufacturing purposes.[7]

The director has clearly done so here, and we find that he has no responsibility under section 62062, subdivision (b) to set prices that guarantee an adequate supply of cheese or other manufactured products to the consumer.

### CONSTITUTIONALITY OF SECTION 62062, SUBDIVISION (B), AS INTERPRETED ABOVE

■ Anticipating our holding in the preceding section, appellants and amicus curiae next contend that such a holding is unconstitutional. Appellants base their claim on the theory that a milk pricing scheme that does not insure the supply of cheese favors only the monetary interests of milk producers. It then cites *State Board* v. *Thrift-D-Lux Cleaners* (1953) 40 Cal.2d 436 [254 P.2d 29], in support of the proposition that "[s]tatutory price fixing schemes which are merely intended to benefit the recipients of the fixed price, and not the general public are unconstitutional." In that case, our Supreme Court declared unconstitutional certain minimum price provisions of the Dry Cleaners' Act of 1945. The court distinguished the milk cases, finding that "[b]ecause of the closeness of the milk industry to the public health the Supreme Court saw fit to classify it as 'affected with a public interest,' or subject to price regulation for the public good. But it does not follow that all other businesses in which the public is served should fall within the same classification." (*Id.*, at pp. 445-446.) In another passage, the

---

[7]As we found in *Parnell*, "The second paragraph of [section 62062] . . . requires the director to 'take into consideration' any 'relevant economic factors,' including listed factors, but it does not say how he or she considers the factors, or the weight to be given to the factors he or she finds relevant. This process is the essence of the director's quasi-legislative function."

court cited *Jersey Maid Milk Products Co.* v. *Brock, supra,* 13 Cal.2d 620, saying, "There . . . it was held that there is a public need for a constant supply of pure, wholesome milk; that the milk industry concerns not only the economic welfare but the health of the public in general, and legislation which aims to protect that general welfare through an initial protection of an industry is within the scope of the police power." (*Id.,* at p. 447.)

The same is true here. The constitutionality of the statutes regulating milk production and pricing has been well established since the Supreme Court's decision in *Nebbia* v. *People of State of New York* (1934) 291 U.S. 502 [78 L.Ed. 940, 54 S.Ct. 505, 89 A.L.R. 1469] and our Supreme Court's decisions in *Jersey Maid Milk Products Co.* v. *Brock, supra,* 13 Cal.2d 620, *Ray* v. *Parker, supra,* 15 Cal.2d 275, and *Knudsen Creamery Co.* v. *Brock, supra,* 37 Cal.2d 485. The statutes primarily protect the consumer, not milk producers, by protecting the quality and quantity of the milk they drink. The legislative purposes are clear, and the statutory scheme does not unconstitutionally favor producers over all others. (§§ 61801-61810.)

In addition, as stated in section 61807, nothing in chapter 2 "permits or authorizes the development of conditions of monopoly in the production of market milk. In the establishment of the terms and conditions under which market milk shall be purchased from producers, the terms and conditions are those which will, in the several localities and markets of the state, and under the varying conditions of production, insure an adequate and continuous supply of pure, fresh, wholesome market milk to consumers of the market milk."

Accordingly, the director's contention that he has no responsibility under section 62062, subdivision (b) to set prices that guarantee an adequate supply of cheese or other manufactured products to the consumer is not only correct, it is constitutional.

### Appellants' Attack on the Minimum Price Formula

 Appellants allege that the director acted in an arbitrary and capricious manner in establishing three components of the minimum price formula: (1) the cheese price (by including a moisture adjustment); (2) the cheese manufacturing cost allowance; and (3) the cheese yield. As appellants note, the cheese specific formula is designed to be " 'the best measure of the value of milk used in manufacturing cheese.' " We only decide whether the cheese specific formula is a permissible formula, not whether it is the "best formula."

## THE CHEESE PRICE COMPONENT OF THE FORMULA

Appellants and amicus curiae testified at the administrative hearing in favor of a cheese specific formula, although they urged adoption of the NCE price. The director adopted the SPP price instead, explaining that "[t]he SPP is an actual market price, while the NCE price is an indicator of market movement." There was testimony that, in recent years, cheese prices have rarely been below the support price.

Appellants do not contest the director's power to adopt the SPP price as the foundation of the new cheese specific formula. They do contest the modification of that price by a moisture allowance.[8] We therefore turn to that subject.

## THE MOISTURE ALLOWANCE

The economic basis statement states the following reasons for adoption of a moisture allowance: "Both the NCE price and SPP reported in Dairy Market News are for cheese with a moisture content of 39%, the maximum legal moisture for cheddar cheese. The maximum moisture that the Commodity Credit Corporation will buy is 38.5%. The moisture content is important in determining a cheese market price since both the NCE and SPP posted prices are increased for cheese with moisture less than the 39% standard. [¶] In order to properly reflect a market value for cheese, an appropriate moisture level must be selected. Department Exhibit U shows that the moisture in California cheddar cheese ranges from 35.93% to 38.16%. Variance in moisture of cheese is another factor that will affect the cheese yield. [¶] After reviewing and considering all data and testimony, it was determined that a moisture level of 36.7% is reasonable and should be adopted. [¶] The SPP which is at 39% moisture must be corrected to 36.7% moisture in order to reflect the correct finished product value in the Class 4b formula. Multiplying the SPP by 1.0377 will make this conversion . . . ."

Appellants argue that no moisture adjustment should be made because there is no evidence that cheese manufacturers selling in the commercial market can obtain a moisture premium for their cheese. However, at the hearing, the Dairy Institute representative was asked: "[Board Member]: And

---

[8]Appellants cloud the issue by arguing that the "uncontroverted evidence [shows] that the 'NCE price,' *unadjusted by any increase due to moisture content*, formed the basic indication of the commercial market value of cheese." However, the director did not adopt the NCE price. Instead, he adopted the SPP price, and there was evidence that the SPP price *is* adjusted by a moisture allowance.

in the case of price, Green Bay should not be moisture corrected, but the support purchase price should be, if both those prices were to be used. [¶] [Dairy Institute representative]: That's correct. Because the government does provide for a moisture adjustment, moisture premium adjustment."

In a posthearing brief, the Dairy Institute said: "In Dairy Institute's direct testimony and in response to questions from the hearing panel, I stated that the commercial market for cheese (except for further processing) does not provide moisture premiums as paid by USDA's Commodity Credit Corporation [CCC] for cheese below 37.7% moisture. In amplification of my testimony on this subject, it should be noted that while cheddar cheese *actually sold on the National Cheese Exchange* (NCE) earns a moisture premium, less than 1% of U.S. cheddar cheese production is directly traded on the NCE. . . . [¶] Non-processing purchasers of cheddar cheese at the wholesale level do not pay a moisture premium because they cannot recover such a premium from the marketplace. Institutional users as well as supermarket buyers do not pay moisture premiums because their customers do not recognize any economic value in cheese of low moisture content."

Even the formula proposed by Golden Cheese used moisture-adjusted CCC support prices. Appellant Leprino Foods stated its argument as follows: "Use of a moisture adjustment factor is inappropriate since only a very small percentage of cheese sold extracts a moisture premium. . . . The Dairy Institute suggested, in Option 2, use of a moisture correction as a means to move from a support price to a commercial market and only as an alternative to a true commercial market option, where the price floated above and below support. As we testified, this true commercial market option would be our preference." It therefore appears from appellant Leprino's testimony that the moisture allowance was needed to adjust the support price, based on a moisture content of 39 percent, to a commercial market in which cheddar is sold with an average moisture content of 36.7 percent.

Appellants also argue that the SPP moisture adjustment has nothing to do with the market value of cheese. However, their own proposed formula included moisture-adjusted CCC support prices. As appellant Leprino noted, the director found that such an allowance was necessary to convert from an SPP price to a market price.

We find that the director's determination was neither arbitrary nor unsupported by the evidence.

### THE MANUFACTURING COST ALLOWANCE

The setting of a manufacturing cost allowance, or make allowance, is at the core of the director's quasi-legislative responsibility. The allowance set

here, 19.5 cents per pound, was supported by substantial testimony at the hearing. According to the witnesses and the department's cost studies, there was a wide variation in actual costs among California cheese manufacturers surveyed. The nine manufacturers surveyed produced 81 percent of the cheddar and jack cheese produced in California and 50 percent of all cheese. The range was from 12.37 cents per pound to 30.13 cents per pound. The weighted average was 20.77 cents per pound. The national average cost was 14.98 cents per pound. The director agreed that the cost of manufacturing cheese in California was higher than in other states.

The manufacturing cost allowance set by the director, 19.5 cents per pound, was set to cover "reasonably efficient plants." The director found: "[i]t is unreasonable to set a higher manufacturing cost allowance both because the resulting reduced Class 4b price would no longer be in reasonable and economic sound relation to producer costs and because it would no longer result in reasonable price relationships among the various classes of milk, especially the relationship between Classes 4a and 4b." As a representative of California Cooperative Creamery testified: "it is not appropriate in this time of milk shortage for the State of California to set the class 4b price so low that it would cause a cheese plant to survive in this State whereas it would be unable to survive in any other State in the nation."

The director found that the three highest cost plants in the study, which had direct costs in excess of twenty-four cents per pound, are not reasonably efficient and that the manufacturing cost allowance should be set at a level which will only cover the manufacturing costs of reasonably efficient plants. The director also found that a manufacturing cost allowance which was set at a greater level would disrupt the requisite price relationships between the various classes of milk.

Appellant Golden Cheese is one of the three plants referred to by the director.[9] It will therefore be unable to pass all of its direct costs back to the producers.

Golden Cheese attacks the director's decision by contending that the decision is not supported by the evidence or statutory authority. Specifically, it attacks the finding that the three high-cost plants were not reasonably efficient. While acknowledging the factual ranking of cheese producers by cost, it argues that the reasons for high or low costs were not explored by the

---

[9]The effect of the director's decision is that Golden Cheese, and the other two least efficient plants, would not recover their costs of production or make a return on their investment when cheese prices are at federal support levels, although current prices were well above federal support levels. The formula is constructed so that price increases above federal support levels are shared 86 percent to producers and 14 percent to manufacturers.

director, and those reasons would show the legitimacy of the cost levels. Assuming the cost levels are legitimate, Golden Cheese contends that the director had no basis for finding those plants to be "economically wasteful." Although the term is apparently taken from section 61802, subdivision (e),[10] Golden Cheese argues that there is no evidence to suggest that it could or should be operated at lower costs.

Golden Cheese contends that the reasonable efficiency standard is no standard at all. It also argues that the "specific findings directed against individual plants are quasi-judicial in nature . . . ."

We disagree. While the specific plant data was discussed at the hearing, the owners of the plants were not identified. Golden Cheese chose to identify itself as one of the high cost plants. Such self-identification does not turn a quasi-legislative proceeding into a quasi-adjudicatory proceeding. Furthermore, we agree with interveners-respondents that the director did not need to make findings of inefficiency in order to make findings of efficiency, i.e., to choose an average manufacturing cost based on national and California data.

Golden Cheese's arguments are based on the implicit assumption that the director should have had evidence of "economic waste" before him or that he should have set the manufacturing cost allowance high enough to cover all cheese plants, not just reasonably efficient cheese plants.

This type of argument was rejected by our Supreme Court in *Challenge Cream etc. Assn. v. Parker* (1943) 23 Cal.2d 137 [142 P.2d 737, 149 A.L.R. 1203]. Discussing the Milk Control Act, the court said: "The purpose of the act can be fairly summarized as follows: That the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the marketing area. . . . [¶] It is of particular significance in this connection that nothing in the act prevents a particular producer or distributor from selling at the minimum price even though, by the use of more expensive equipment or unwise management, he is marketing his product at a price less than enough to return to him a reasonable profit." (*Id.*, at pp. 141-142.)

Similarly, in *Emby Foods, Inc. v. Paul, supra,* 230 Cal.App.2d 687, the court said: "Furthermore, the director is authorized to fix prices below cost

[10]Section 61802, subdivision (e): "It is the policy of this state to promote, foster, and encourage the intelligent production and orderly marketing of commodities necessary to its citizens, including market milk, and to eliminate economic waste, destructive trade practices, and improper accounting for market milk purchased from producers."

and a reasonable return . . . where necessary to carry out the purposes of the act . . . . [¶] The director's authority to set minimum prices within methods of distribution at higher or lower than the cost plus return on investment standard in order to achieve stability has been repeatedly upheld by the courts [citations.]" (*Id.*, at pp. 698-699.)

We therefore reject appellants' argument to the extent that it is based on the assumption that the director must adopt a manufacturing cost allowance that allows all manufacturers to recover their costs and a return on investment at the expense of producers.[11]

To the extent that appellants' argument is based on an alleged insufficiency of the evidence, we also reject it. The record contains evidence that the average cost of producing cheese in California was 20.77 cents per pound, while the director adopted 19.5 cents per pound. The director also found that a higher manufacturing cost allowance would upset the reasonable and sound relationship that the director is required to maintain between class 4a and class 4b prices.[12]

There is no basis for suggesting that the director acted arbitrarily in deciding these issues, which are particularly within the director's expertise. Accordingly, there is no basis for setting aside the director's discretionary decision.

The words of *E. M. Consumer Corp.* v. *Christensen, supra,* 47 Cal.App.3d 642, are particularly applicable here: "As frequently stressed in cases, the establishment of minimum prices involves highly technical matters requiring the assistance of trained experts and economists, and the gathering and study of large amounts of statistical information. One of the primary purposes of price setting under the act is to insure a sufficient supply of milk. As a consequence, the Director's authority to set prices within methods of distribution at higher or lower than the cost plus return on investment standard in order to achieve stability has been repeatedly upheld by the courts

[11]Even amicus curiae, the Dairy Institute, testified that the use of a weighted average cost was proper.

[12]Despite some argument that the manufacturing cost allowance for class 4b should be set in the same manner as the allowance for class 4a, there was evidence that the costs were different. For example, a representative of Western United Dairy testified: "We note that consistent conservative policy of cheese make allowance is made more difficult by the fact that the exact opposite conditions exist in the cost/volume comparisons between butter/powder plants and cheese plants. [¶] According to the state's exhibits, the high-volume butter and powder plants are the lower cost plants, whereas in the cost exhibits for this hearing, the high-volume [cheese] plants seem to be the high cost plants, also. [¶] This defies all sound economic sense; and from a producer standpoint, this means some belt tightening on their part is required. . . . [¶] Frankly, producers cannot afford to support such unreasonably high costs."

[citations]. Appellants have failed to advance a convincing argument, let alone significant data, which would compel a deviation from the well established principle which requires deference to the decision of the Director in such matters." (*Id.*, at pp. 651-652.)

### THE YIELD FACTOR

Appellants next argue that the yield factor chosen by the director is fundamentally inconsistent with the director's findings. Its legal argument rests on section 62076, subdivision (c), which requires the director to consider the value of milk used for manufacturing purposes "giving consideration to any relevant factors including . . . product yields . . . ." We find no violation of this section, nor section 62062, because the record is clear that the director did "consider" the factors he deemed "relevant," even if appellants disagree with the director's decision.

The director stated: "Witnesses suggested a number of different methods to determine the statewide yield factor. Cheese processors suggested that a weighted average method should be used. There was some discussion on using the median. Several producers suggested using the USDA standard of 10.1. . . . [¶] Department data shows cheese yields range from 9.3 to 10.9 pounds of cheese per hundredweight of milk for the California plants studied. California cheese yields appear to be slightly lower than those experienced in other milk production areas." The director selected a yield figure of 9.8 "for reasonably efficient California plants . . . ."[13]

As interveners-respondents point out, Golden Cheese itself proposed that "The yield should be based upon the actual weighted average yield of Cheddar cheese produced from California milk (adjusted to common fat, SNF and moisture bases)" using a yield factor of 9.76. Appellant Leprino Foods proposed a yield factor of 9.86 and amicus curiae Dairy Institute advocated a weighted average cheddar cheese yield based on the experience of California manufacturers. According to its expert, the weighted mean yield was 9.95.

Appellants argue that the director's California yield figure of 9.8 is actually higher than the USDA figure of 10.1, when converted to comparable figures by use of an industry formula known as the Van Slyke formula. They then contend that this higher figure conflicts with the director's finding that cheese yields from California milk are generally lower than the national average.

---

[13]According to appellants, the higher the yield number, the higher the class 4b minimum milk price.

In response, the director finds the mathematical conversion invalid because, according to him, the Van Slyke formula was not used to determine the national standard of 10.1, and appellants' conversion is therefore invalid.

Without entering any further into the arcane world of milk composition,[14] we think it is clear that the director's decision was almost precisely the weighted average yield of the nine plants he studied. Whether higher or lower than the national average, the director's decision is certainly within the permissible range of the director's discretion, and no abuse of discretion has been shown.

### DIFFERENCES BETWEEN CLASSES 4A AND 4B

Appellants next contend that the director's price order discriminates against class 4b manufacturers, and in favor of class 4a manufacturers, in three ways: first, manufacturers of 70 percent to 85 percent of class 4a products are able to fully recover their costs of production plus a reasonable rate of return, while only 30 percent of class 4b cheese manufacturers can do so. Second, the financial returns to class 4a manufacturers are therefore much higher than class 4b manufacturers. Third, the effect of such discrimination is to favor and encourage butter and nonfat powder production over cheese production.

In *Parnell*, we rejected a similar argument, noting that the differences between the butter and nonfat milk powder producers (class 4a), on the one hand, and the cheese manufacturers (class 4b), on the other hand, were sufficient to support both the statutory classification and the differences in the director's treatment of the two classes. The differentiation between the two groups, long the goal of those advocating a class 4b formula based on California specific cheese elements, was the main reason for the subject hearing.

Such a differentiation was supported by testimony given at the hearing. For example, the representative of amicus curiae Dairy Institute testified: "I don't think there's any magic differential between 4a and 4b. Again, I think

---

[14]According to respondent department, the USDA national standard yield is 10.1 pounds of cheese per hundred pounds of market milk, assuming a moisture content of 39 percent and a fat content of 3.67 percent. It argues that this standard yield is not calculated by using the Van Slyke formula, and that appellants' comparison, which does use the Van Slyke formula, is therefore invalid. The department contends that to reach the 10.1 standard using the Van Slyke formula, the parties would have to set the third component, solids-not-fat (SNF) at 8.35 percent, instead of the California average of 8.72 percent. In our view, the mathematical calculations are irrelevant. The only relevant consideration is that there is actual California yield data in the record that supports the director's decision.

it has to be sort of a differential that is supported by different economic conditions for the plants that are making those two groups of profits [*sic*, products]."

The representative of California Cooperative Creamery testified: "Setting the Class 4b price higher in no way reduces the ability of cheese plants to pay more for milk based on its yield differential. [¶] However, it does level the playing field for other plants which are also competing for milk to serve consumer needs. [¶] We feel that the Department should recognize that cheese makers have the economic opportunity to select their milk on the basis of its protein content. [¶] And in contrast, butter/powder plants, bottling plants, ice cream plants, and other manufacturers do not have this economic opportunity, because they are already paying for milk on its yield basis, due to our state administered butter fat and solids nonfat component pricing. [¶] Consequently, all non-cheese plants can have their milk supply placed in jeopardy by the bidding activities of cheese plants, particularly if the Class 4b price is set too low."

California Milk Producers testified: "We have reviewed the Department's Exhibits for this hearing, and have been further convinced that an appropriate manufacturing allowance for cheese, based on the same methodology as butter and powder class 4a is simply not possible."

Appellants' current argument that the price formulas for the two classes should be set according to the same methodology, with the same opportunity to recover costs and returns, contradicts their earlier desire for a California cheese specific cost formula. Having gotten what they sought, they now want the best of both formulas. Since the Legislature has adopted and defined the different classes of milk, appellants' argument is more properly addressed to the Legislature than to the department or this court. We find no legal reason that industries that are not alike need to be treated alike in setting the pricing formula. The differences found by the director were supported by the evidence and carry out his duty to set prices for the various classes of milk that bear a reasonable and sound economic relationship to each other.[15] (§ 62062, subd. (c).)

## CONCLUSION

We therefore conclude that appellants have not borne their heavy burden of showing that the director acted arbitrarily, capriciously, or without evi-

---

[15]For example, appellants complain of differences in the manufacturing cost allowance between classes 4a and 4b. (See fn. 12, *ante*.) However, the department held an entire hearing devoted to this subject in June 1988, and the transcript of that hearing was incorporated into the record here. The department concluded that the class 4a make allowance should be reduced but that there was insufficient data to reduce the class 4b make allowance at that time. This was the first time the two formulas differed.

dentiary support in establishing a cheese specific formula for class 4b. While section 62062, subdivision (c) requires the director to take into consideration that the prices he or she establishes "bear a reasonable and sound economic relationship to each other," appellants have not demonstrated that the director failed to do so. The class 4b pricing formula chosen by the director may not be the best formula for appellants, but it is clearly a permissible formula. Accordingly, the trial court properly denied appellants' petition for a writ of mandate to set aside the director's decision.

## DISPOSITION

The judgment denying appellants' petition for writ of mandate is affirmed in all respects.

Timlin, J., and McDaniel, J.,* concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied August 29, 1991.

---

*Retired Associate Justice of the Court of Appeal, Fourth District, sitting under assignment by the Chairperson of the Judicial Council.