**STRAUS FAMILY CREAMERY, et al.  Plaintiffs,**

**v.**

**William B. LYONS, Defendant.**

**No. C02–1996 BZ.**

United States District Court, N.D. California.

Sept. 3, 2003.

Aviva Cuyler, Robert M. Chilvers, Chilvers & Taylor PC, San Rafael, CA, for Plaintiffs.

Ellen M. Peter, Linda L. Berg, California Attorney General's Office, Sacramento, CA, for Defendant.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ZIMMERMAN, United States Magistrate Judge.

Plaintiffs Straus Family Creamery, Inc. and Horizon Organic Holding Company, certified organic milk processors in Northern California, filed this action against defendant Secretary of the California Department of Food and Agriculture ("Secretary"), alleging that the milk pricing and stabilization program created by the Milk Stabilization Act, California Food and Agriculture Code sections 62061, *et seq.*, and the Gonsalves Milk Pooling Act of 1967, California Food and Agriculture Code sections 62700, *et seq.*, (collectively, the "Pooling Plan"), as applied to plaintiffs violates their equal protection and substantive due process rights.[1] Plaintiffs also allege that the procedure for resolving plaintiffs' proposed amendment to the Pooling Plan violates their procedural due process rights. The parties filed cross-motions for summary judgment, which were heard on July 30, 2003.[2]

## THE MILK REGULATORY SCHEME

Since 1935, the milk industry in California has been regulated pursuant to the Milk Stabilization Act. Prior to 1967, the Secretary set minimum prices for raw milk depending on the end-use of that milk. Under this system, raw milk used for fluid milk had the highest value in the marketplace and highest minimum price. Raw milk used for other products, such as cheese, had lower values and lower minimum prices. This tiered pricing structure contributed to the destabilization of the market for fluid milk as producers (or farmers) competed to sell their milk for use as fluid milk. *See* Cal. Food & Agric. Code § 62701 (declaring that "unfair, unjust, destructive and demoralizing trade practices have appeared within this industry . . . .").

To address deficiencies in this pricing scheme and to stabilize the milk market, the legislature enacted the Gonsalves Milk Pooling Act. Pooling reallocates money among processors of various dairy products to ensure constant supply of all those products. The current Pooling Plan implements that Act. A general description of the Pooling Plan appears in *Ponderosa*

---

1. The parties have consented to the jurisdiction of a United States Magistrate Judge for all proceedings, including entry of a final judgment, pursuant to 28 U.S.C. § 636(c).

2. On August 28, 2003, I held a further hearing to receive evidence on a disputed issue of fact—whether defendant considers organic production costs in setting minimum milk prices. I have issued separate findings which resolve that issue.

*Dairy v. Lyons,* 259 F.3d 1148, 1151–52 (9th Cir.2001) *cert. granted,* 537 U.S. 1099, 123 S.Ct. 818, 154 L.Ed.2d 766 (2003), *judgment vacated on other grounds,* —— U.S. ——, 123 S.Ct. 2142, 156 L.Ed.2d 54 (2003).

When the Pooling Act was passed in 1967, the milk industry was homogenous. Specialty niches have since appeared, the largest of which is organic milk. Other niches include high-protein milk, milk with lower bacteria counts and milk without growth hormones. Plaintiff Horizon is the leading marketer of organic dairy products in the United States and in the United Kingdom. It markets milk, cheese, butter and other dairy products throughout the United States. Plaintiff Straus is a family-owned corporation formed to process milk produced by the family's organic farm. Currently a regional marketer of milk, cheese, butter and yogurt, it is opening an ice cream facility and hopes to market its products nationally. While in the past ten years, the organic milk industry has grown significantly—one estimate is 20% per year—it occupies a small fraction of the entire milk industry. In 1999, organic milk amounted to 0.12% of all the milk produced in California. Of California's approximately 2200 dairy farmers, an estimated 13 are organic.

This lawsuit arises from perceived inequities in the current Pooling Plan, which plaintiffs allege violate their constitutional rights. These inequities are illustrated by a hypothetical I posed during the hearing. In the hypothetical, the milk market consisted of two end-products, fluid milk and cheese.[3] The pool price, the minimum price that processors (typically dairies) are obligated to pay to producers (or farmers) per hundredweight of raw milk, was $13.00. The minimum classification price, or the amount for which the processor must account to the pool, was $14.00 for fluid milk, whether conventional or organic, and $12.00 for cheese milk, whether conventional or organic.[4] The producers' costs of production were $12.00 for conventional milk and $15.00 for organic milk. Finally, the contract price for organic raw milk, or the price organic producers demand because of higher production costs, was $18.00.[5]

Based on these assumptions, the parties agreed that a conventional processor purchasing a hundredweight of milk for fluid milk would pay $13.00 (pool price) to the producer and $1.00 to the pool (minimum class price less pool price). A conventional processor of cheese purchasing a hundredweight of milk would pay $13.00 (pool price) to the producer and would receive $1.00 from the pool (pool price less minimum class price).

The parties also agreed that an organic processor purchasing a hundredweight of milk for fluid milk would pay $18 (contract price) to the producer and $1 to the pool (minimum class price less pool price). An organic processor of cheese purchasing a hundredweight of milk would pay $18 (contract price) to the producer and would receive $1 from the pool (pool price less minimum class price). Because presently 90% of organic raw milk is used to produce fluid milk, the Pooling Plan causes plain-

---

**3.** In actuality, the milk market consists of five classes: Class 1 (fluid milk), Class 2 ("soft" dairy products), Class 3 (frozen dairy products), Class 4a (butter/powder) and Class 4b (cheese).

**4.** The pool price is the weighted average of the five minimum classification prices.

**5.** There is no dispute that unless organic processors were willing to pay a premium over the current pool price, producers would not convert to organic milk production because of the higher costs associated with organic production. Many of these costs are driven by the need to comply with the National Organic Program, 7 C.F.R. Part 205, et seq.

tiffs to pay far more into the pool than they receive back from the pool. A plan that produces such a disparity, plaintiffs complain, is arbitrary and irrational.

There is no claim in this lawsuit that organic producers are entitled to a higher minimum price. Nor is there a claim by organic processors that the Pooling Plan somehow causes the organic milk market to not accommodate the high transaction prices they must pay for organic milk. Put another way, the relief plaintiffs seek could benefit them, but not necessarily the farmer or the consumer.

### THE POOLING PLAN IS NOT UNCONSTITUTIONAL

The issue before me is not whether there is a better way for California to regulate the organic milk industry, such as by having a separate pool for organic milk. The issue is only whether there is a rational basis for the Pooling Plan. Equal protection and substantive due process challenges to a state regulatory scheme are reviewed under the rational basis test.[6] Plaintiffs' challenge fails because the Pooling Plan is rationally related to a legitimate government interest.[7] *See Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 124–25, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). Plaintiffs have not proven that the state's action was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Village of Euclid v.*

*Ambler Realty Co.,* 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926).

There is no dispute that California has a legitimate interest in the health and welfare of its citizens who consume milk. However, plaintiffs contend that the means for carrying out this legitimate interest—the Pooling Plan—is unconstitutional as applied to them. As plaintiffs see it, the Pooling Plan has two principal purposes: to establish minimum prices so as to generate reasonable producer incomes and to eliminate unfair practices resulting from producers competing to obtain the "highest value" fluid milk contracts. Plaintiffs contend that it is arbitrary and irrational to apply the Pooling Plan to organic milk processors because the Plan does not generate reasonable incomes for organic producers, only for conventional producers. This is because the minimum price guaranteed to all producers falls below the cost of organic milk production; indeed plaintiffs claim that cost of production is not a factor in setting the minimum price. Plaintiffs also contend that it is arbitrary and irrational to require organic processors to contribute to a pool that, they assert, is designed to eliminate competition for conventional fluid milk sales and has no impact on sales of organic milk to organic processors.

The basic flaw in plaintiffs' arguments is that they confuse the overall purpose of the Pooling Plan with two of the means of

---

**6.** This is because organic milk processors are not a suspect class and the right to process milk is not a fundamental right. *See e.g., Country Classic Dairies, Inc. v. Montana,* 847 F.2d 593, 596 (9th Cir.1988).

**7.** The only reported case to have considered a similar constitutional challenge upheld the Northeast Dairy Compact's generally applicable "over-order" price (the minimum price paid to producers for milk) regulation as applied to organic milk handlers. *See The Organic Cow, LLC v. Northeast Dairy Compact*

*Commission,* 46 F.Supp.2d 298, 306 (D.Vt. 1999) (denying the equal protection and due process challenges to the over-order price regulation and holding that the over-order price, which was used to maintain a region's economy by guaranteeing a minimum price to farmers, was a rational means to achieve the stated purpose of ensuring a stable supply of wholesome milk from businesses as an integral part of the region's economy, even though the over-order price did not recognize any difference in economics between conventionally and organically produced milk).

achieving that purpose. The overriding purpose of the Pooling Plan is to protect consumers by protecting and stabilizing the quantity and quality of the milk and milk products they consume. *See Golden Cheese Co. of Cal. v. Voss,* 230 Cal.App.3d 547, 562, 281 Cal.Rptr. 587 (1991); *E.M. Consumer Corp. v. Christensen,* 47 Cal. App.3d 642, 647, 121 Cal.Rptr. 177 (1975) (finding that "the all pervasive end of the [Milk Stabilization] act is that 'the people shall be able to purchase milk at the lowest price at which enough distributors operating with average efficiency will be able to do business at a reasonable profit so as to supply the demand of all the consumers in the marketing area.' ") (quoting *Misasi v. Jacobsen,* 55 Cal.2d 303, 309, 10 Cal. Rptr. 850, 359 P.2d 282 (1961), citing *Challenge Cream & Butter Ass'n v. Parker,* 23 Cal.2d 137, 141–42, 142 P.2d 737 (1943)); *see also* Cal. Food & Agric. Code §§ 61801 (the Milk Stabilization Act was enacted for the purpose of "protecting the health and welfare of the people of this state"); 62700 (the Gonsalves Milk Pooling Act was enacted for the purpose of "protecting the health and welfare of the people of this state"); 62702 (declaring that the purposes of the Gonsalves Milk Pooling Act are to "develop and maintain satisfactory marketing conditions and bring about and maintain a reasonable amount of stability and prosperity in the production of fluid milk and fluid cream" and to "insure to consumers within California an adequate and continuous supply of pure, fresh and wholesome milk at fair and reasonable prices").

On the whole, the Pooling Plan appears to meet its goal of consumer protection through stabilization of the market. Judicial segregation of organic milk processors from the overall pooling plan could tend to destabilize the milk market and fragment an industry that the legislature has seen fit to treat as a whole.[8] At the hearing, plaintiffs did not dispute that if a processor, conventional or organic, used equal amounts of raw milk for fluid milk and for cheese, the amounts the processor paid to the pool and received from the pool would be a wash. The parties also agreed that all producers receive at least a minimum price for their milk, regardless of consumer market conditions. While the minimum price currently is less than an organic producer's costs of production, it still provides such producers with a safety net. It is also likely that as the organic milk industry grows, the contract price and the costs of production will fall in the face of increased competition and volume.

Exemption from the pool of organic processors is a slippery slope that could foster market instability. This is true even though the organic milk industry currently accounts for a small percentage of the entire milk market. Other specialty milk processors, such as those that process milk without growth hormones, could advance many of the same arguments that plaintiffs make here in an effort to obtain an exemption from the pool. Such instability appears to have troubled the Legislature as it considered proposals to exempt other categories of milk from leaving the Pool. *See, e.g.,* Stats.1996 c. 759 (S.B.1885); Assembly Floor Analysis SB 1885 (http://www.leginfo.ca.gov/pub/95–96/bill/sen/sb_1851–1900/sb_1885_cfa_960820 _205556_asm_floor.html) (**"Continued degradation of the pool could ultimately lead to the demise of the pooling system** as established by California producers.") (emphasis added); Assembly on Agricul-

---

**8.** It bears repeating that no claim is advanced on behalf of organic producers, who among other things, always have the option of selling organic raw milk to conventional processors if there is a surplus of organic raw milk.

ture, May 12, 1999 Bill Analysis, AB 1470 http://www.leginfo.ca.gov/pub/99–00 ll/asm/ab_1451–1500/ab_1470_cfa_19990520 102956_asm_com.html) (**"By taking any milk out of the pool system the pool suffers** and therefore, all producers in the pool suffer. In order to maintain the integrity of the pool, SB 1885 was passed ... to prevent producers from jumping in and out of the pool.") (emphasis added).

Moreover, separation of specialty groups from the Pooling Plan is a matter for the legislature, not the courts. *See Cornwell v. Hamilton,* 80 F.Supp.2d 1101, 1104 (S.D.Cal.1999) ("[T]he Court does not write laws for the State of California, nor does it mandate new regulatory programs. That is the role of the Legislature, and of state agencies should the Legislature properly delegate such authority. The Court's only role is to decide whether the means used to regulate the activities in question are constitutionally permissible."). This is especially true here where the statutory scheme does not appear to provide for separate stabilization plans or pooling plans based on any criteria other than geography. *See* Food & Agric. Code §§ 61830, 62064, 62704, 62706.

■ Relying heavily on *Cornwell,* plaintiffs claim that their equal protection rights have been violated because defendant is treating organic processors, who are subject to organic food laws, in the same manner as conventional processors, who are not. *See Cornwell,* 80 F.Supp.2d at 1103 ("Sometimes the grossest discrimination can lie in treating things that are different as though they were exactly alike."). However, this case is unlike *Cornwell,* in which the district court found that the State's application of the cosmetology licensing requirements to plaintiff, a hair braider, was irrational because the cosmetology curriculum did not teach braiding and required hair braiders to learn too many irrelevant or harmful tasks.

Here, organic milk processors are part of the milk industry and their activities substantially overlap those of conventional milk processors. While they are subject to additional regulations, organic milk processors are not so different from other milk processors that it would be irrational to apply the pooling plan to them. Plaintiffs' emphatic argument that organic milk products and conventional milk products are two completely separate commodities is not persuasive, especially since, in times of surplus, organic milk producers can and do sell to conventional processors.

Moreover, unlike the cosmetology requirements, the Pooling Plan is flexible. The formulas used by defendant to set the minimum classification prices contain elements which can be adjusted to account for increased costs of production. As the number of organic farms increase and their higher costs are captured for inclusion in the formulas, the industry's overall production costs will rise, and the Secretary can consider those increased costs in setting the minimum prices. In addition, unlike the instant case, *Cornwell* involved a licensing scheme in which there is no risk of destabilizing an entire regulatory scheme if certain individuals or groups are excluded.

At bottom, plaintiffs' argument is based on their perception of unfairness in the system. Because the organic milk industry is in its infancy, the pool prices are less than the costs of organic farming. However, because the system used by the Secretary to establish minimum and pool prices is flexible, as discussed above, these prices may well increase as the organic industry grows and its higher costs of production are included in the price setting formulas. Likewise, as the organic industry moves into production of cheese and products

other than milk, the imbalance between plaintiffs' pool debits and credits should diminish. And should the organic industry develop to the point where it could become subject to the sort of unfair practices the milk industry experienced prior to the enactment of the milk regulatory laws, plaintiffs have not claimed that the Pooling Plan would not serve to stabilize the organic milk industry as well. A perception of unfairness alone, especially where, as here, it may be short term, does not rise to the level of a constitutional violation.

## THE DUE PROCESS CHALLENGE IS NOT RIPE FOR REVIEW

Plaintiffs also contend that defendant's application to plaintiffs of the procedure contained in California Food and Agriculture Code section 62717(b) regarding amendments to the Pooling Plan violates their procedural due process rights. *See* Cal. Food & Agric. Code § 62717(b) ("The director may amend the plan ... if he finds that the amendment is necessary to effectuate the purposes of this Chapter.... The director may make substantive amendments to the plan only if producers assent to the proposed amendments at a referendum ....").

In 2000, plaintiffs proposed an amendment to the Pooling Plan that would establish an alternative discounted pool obligation for organic processors. *See* Declaration of Aviva Cuyler Ex. L. After a March 2001 public hearing in which organic and conventional milk producers and processors participated, orally and in writing, the Secretary found that "... the current Milk Pooling Plan for Market Milk (Pool Plan) continues to effectuate the declared purposes of the Cali-

fornia Food and Agricultural Code." Cuyler Decl. at Ex. C at 2. The Secretary also recognized that the proposed amendment would likely be rejected by a referendum because significantly more producers were opposed to the amendment than supported it. *Id.* at 11.

█ Plaintiffs argue that applying the referendum requirement to their proposed amendment violates their procedural due process rights because the vast majority of producers statewide are conventional farmers with interests adverse to plaintiffs.[9] However, this claim is not ripe. Plaintiffs do not seek a court order requiring the Secretary to adopt plaintiffs' proposed amendment or to schedule a referendum on plaintiffs' proposed amendment. Because the Secretary did not find that the proposed amendment was necessary to effectuate the purposes of the laws, he had no obligation to submit it to a referendum. I decline to speculate on how the Secretary would have proceeded had he determined that the Pooling Plan needed to be changed, or on the outcome of any referendum on an amendment found by the Secretary to be necessary to effectuate the purposes of the milk regulatory laws.

Accordingly, it is **HEREBY ORDERED** that plaintiffs' motion for summary judgment is **DENIED** and that defendant's motion for summary judgment is **GRANTED**.[10]

---

**9.** Similar regulatory referendum procedures have been upheld against constitutional challenges, even though the voting parties often have interests adverse to the party behind the referendum. *See, e.g., Sequoia Orange Co. v. Yeutter,* 973 F.2d 752, 759 (9th Cir.1992).

**10.** Defendant filed objections to some of plaintiffs' evidence. All of defendant's objections are OVERRULED.